In re TENNESSEE VALLEY STEEL CORP., Debtor.

Michael H. FITZPATRICK, Trustee, Plaintiff,

v.

ROCKWOOD WATER, WASTEWATER AND NATURAL GAS SYSTEMS, Defendant.

Bankruptcy No. 94–32813.
Adv. No. 96–3025.

United States Bankruptcy Court,
E.D. Tennessee.

Oct. 29, 1996.

Additionally, the Trustee seeks to recover prejudgment interest from July 19, 1995, the date the Debtor, while serving as debtor-in-possession, demanded repayment of the disputed transfers. The Defendant stipulates that the Trustee has met his burden of proof on all elements under § 547(b) but relies on the ordinary course of business defense under 11 U.S.C.A. § 547(c)(2) (West 1993) to defeat the Trustee's claim. Alternatively, if the court determines the Defendant is unable to avail itself of the ordinary course of business defense, the Defendant contends it is entitled to an offset against the preferential transfers pursuant to the "new value" exception of 11 U.S.C.A. § 547(c)(4) (West 1993). All issues were tried before the court on September 9, 1996.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(F) (West 1993).

Jenkins & Jenkins Attorneys, PLLC, James C. Cone, Knoxville, TN, for Plaintiff.

Lewis, King, Krieg, Waldrop & Catron, P.C., Rodney A. Fields, Knoxville, TN, for Defendant.

### MEMORANDUM

RICHARD STAIR, Jr., Chief Judge.

The Chapter 11 Trustee, Michael H. Fitzpatrick, commenced this adversary proceeding on February 12, 1996, seeking to avoid and recover five allegedly preferential utility payments made by the Debtor to the Defendant, Rockwood Water, Wastewater, and Natural Gas Systems, totaling $439,436.23. The Trustee's action is grounded on 11 U.S.C.A. §§ 547(b) and 550(a)(1) (West 1993). The parties stipulate that the payments, all made by check within the ninety days preceding the filing of the Debtor's voluntary petition under Chapter 11 on November 11, 1994, were made on the following dates:[1]

| | |
|---|---|
| August 18, 1994 | $ 24.58 |
| August 18, 1994 | 90,565.03 |
| September 2, 1994 | 139,963.40 |
| September 29, 1994 | 103,779.53 |
| October 28, 1994 | 105,103.69 |

## I

### BACKGROUND

The Debtor, Tennessee Valley Steel Corporation, was engaged in the business of processing scrap steel into fabricated steel products prior to the commencement of its Chapter 11 case on November 11, 1994. The Debtor operated what is known as a mini-mill and used natural gas to heat its furnaces and office buildings. The Defendant, a municipal utility, provided natural gas and water to the Debtor under two types of accounts: a house account for typical residential-type gas and water service supplied to the Debtor's offices and a chart account which charted the Debtor's consumption of natural gas utilized by its furnaces in the steel manufacturing process. The Debtor's house account consisted of three numbered accounts, 22–3725–14 (water), 22–3820–47 (gas), and 22–3750–32 (water and gas). The chart account was not identified by an account number but was serviced by a meter that charted the Debtor's gas consumption on a daily basis.

The Debtor paid the Defendant monthly for its utility services upon receipt of invoices

---

1. The stipulated dates are the dates each check was honored by the Debtor's bank. *See Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

which contained the date of the invoice, the nature of service, the consumption for the relevant billing period, a computation of the amount owed, a due date, and a statement that an additional amount of ten percent would be added to the gross billing if payment was received after the due date. The invoices were generated by the Defendant's computer system and were then mailed to the Debtor. The form of the invoices for the numbered house accounts and the chart account was similar, the major difference being that the former were printed on postcard-type forms and the latter were printed on eight and a half by eleven inch paper. In addition, the invoices for the chart account included or followed with a chart prepared by the Defendant from the data produced by the chart gas meter which showed the Debtor's daily consumption of natural gas delivered from the Defendant.

## II

## THE CHART ACCOUNT

The dates of issuance of the monthly invoices for gas billed on the chart account and the due dates stated on each invoice by which the account could be paid without imposition of the late penalty varied monthly. The following table summarizes all transactions between the Debtor and Defendant on the chart account [2] for which the Debtor made payment prior to commencement of the preference period: [3]

### CHART ACCOUNT TRANSACTIONS
### PRIOR TO PREFERENCE PERIOD

| Invoice Date | Amount Due | Date Due | Check Delivered[4] | Amount Paid |
|---|---|---|---|---|
| 11/2/93 | $ 94,788.61 | 11/25/93 | 11/23/93 | $ 87,765.71 |
| 12/14/93 | $122,049.47 | 12/25/93 | 12/27/93 | $108,815.57 |
| 1/17/94 | $112,927.80 | 2/1/94 | 1/31/94 | $101,366.10 |
| 2/17/94 | $112,927.80 | | 2/28/94 | $ 74,119.05 |
| 4/5/94 | $104,185.31 | 4/20/94 | 4/15/94 | $104,002.47 |
| 4/18/94 | $137,450.05 | 5/1/94 | 4/25/94 | $137,450.05 |
| 5/20/94 | $108,820.72 | 5/31/94 | 6/1/94 | $108,820.72 |
| 6/21/94 | $ 99,125.36 | 7/15/94 | 7/12/94 | $ 99,125.36 |

Those payments made within the preference period on the chart account are summarized in the table below.[5]

2. The Trustee only seeks to avoid a single $24.58 payment made by the Debtor on the house account on August 18, 1994. This account will hereinafter be briefly discussed in part V of this Memorandum.

3. The preference period commenced on August 14, 1994.

4. *See infra* n. 6.

5. Two postpetition invoices, dated November 14, 1994, and January 12, 1995, in the respective amounts of $92,210.49 and $44,832.01, neither of which was paid, are not relevant to the issues before the court.

**CHART ACCOUNT TRANSACTIONS
DURING PREFERENCE PERIOD**

| Invoice Date | Amount Due | Date Due | Check Delivered[6] | Amount Paid |
|---|---|---|---|---|
| 7/22/94 | $ 90,565.03 | 8/10/94 | 8/16/94[7] | $ 90,565.03 |
| 8/12/94 | $130,906.90 | 8/30/94 | 8/31/94 | $139,963.40[8] |
| 9/14/94 | $112,836.03 | 9/25/94[9] | 9/27/94 | $103,779.53[10] |
| 10/14/94 | $105,103.69 | 10/25/94 | 10/26/94 | $105,103.69 |

In sum, of the eight invoices dated November 2, 1993, through June 21, 1994, prior to the preference period, five were paid within the due dates stated on each invoice and two, those invoices dated December 14, 1993, and May 20, 1994, were paid after the stated due dates. The February 17, 1994 invoice had no stated due date. With regard to the December 14, 1993 invoice, paid December 27, 1993, its stated due date was December 25, 1993, Christmas Day. The court takes judicial notice that Christmas Day, a national holiday, fell on Saturday in 1993 which means that the next business day was Monday, December 27, 1993, the date the check was delivered. Therefore, payment of the December 14, 1993 invoice could not have been delivered either on the stated Saturday due date or on the following day, Sunday, both of which were non-business days.[11]

Regarding the February 17, 1994 invoice, the proof establishes that the computer which normally produced the Defendant's invoices was not working and that this invoice was therefore typed. The computer generated due date routinely stated on each invoice

was inadvertently omitted by the typist. Neither the Defendant nor the Debtor deemed this invoice to have been untimely paid. The May 20, 1994 invoice was paid on June 1, 1994, the day after the due date stated on the invoice.

Payment of each of the four invoices within the preference period was made after the respective due dates set forth on each invoice. Specifically, payment of the July 22, 1994 invoice due August 10, 1994, was made on August 16, 1994, six days after the stated due date; payment of the August 12, 1994 invoice, due August 30, 1994, was made on August 31, 1994, one day after the stated due date; payment of the September 14, 1994 invoice, due September 25, 1994, was made on September 27, 1994, two days after the stated due date;[12] and payment of the October 14, 1994 invoice, due October 25, 1994, was made on October 26, 1994, one day after the stated due date. Additionally, a ten percent (10%) penalty, or $9,056.50, was assessed the Debtor as a result of its late payment of the July 22, 1994 invoice. The penalty was paid on August 31, 1994, at the time the Debtor paid the August 12, 1994

**6.** While the date each disputed check was honored by the Debtor's bank is material to a resolution of the § 547(b) issue, only the date of delivery by the Debtor of the checks is relevant to the § 547(c) discussion. *See Barnhill*, 503 U.S. at 401–02, 112 S.Ct. at 1391 (noting the different purposes of § 547(c) and § 547(b) and that the Courts of Appeal that have considered the § 547(c) issue have held that under § 547(c) a transfer is determined based on the "date of delivery" rule).

**7.** A penalty of $9,056.50 was assessed the Debtor for the late payment of this invoice.

**8.** This payment includes the $9,056.50 penalty attributable to the Debtor's late payment of the July 22, 1994 invoice.

**9.** *See infra* n. 12.

**10.** The Debtor was given credit for the $9,056.50 penalty, which it paid on August 31, 1994, assessed for its late payment of the July 22, 1994 invoice thereby reducing the amount owing on the September 14, 1994 invoice by an equivalent amount.

**11.** There is no proof in the record that either the Debtor's or Defendant's business offices were open on December 25 or 26, 1993.

**12.** The due date stated on the September 14, 1994 invoice was listed as September 25, 1994, a Sunday. The court therefore finds that payment of this invoice could not have been delivered on this non-business day.

invoice. The Defendant refunded the penalty by crediting it against the amount due on the September 14, 1994 invoice. No penalty was assessed the Debtor regarding any other invoice paid beyond the stated due date within the year preceding the filing of the Chapter 11 petition.

The record establishes that, notwithstanding the due dates specifically set forth on each monthly invoice related to the Debtor's chart account, the Defendant's policy was to allow the Debtor a five-day grace period within which to pay each invoice before assessing the ten percent (10%) late penalty.[13] The grace period was designed to accommodate payments made by mail. Marie Fox, an employee of the Knoxville Utilities Board (KUB), a public utility providing electric, water, and natural gas service to residential and commercial customers throughout the greater Knoxville area, testified that KUB also has a standard procedure allowing a five-day grace period within which its commercial gas customers may pay their accounts without assessment of a penalty but that KUB does not refund penalties charged accounts paid after the grace period.[14] Paula Schmidt, the Debtor's controller, testified that it was her understanding that if payments to the Defendant were mailed by the due date they would be deemed timely even though received after the due date and that this grace period was designed to accommodate payments delivered to the Defendant by mail. Ms. Schmidt also testified that she had this same understanding with all utility companies serving the Debtor and with utility companies serving a former employer, Cascade Steel Company.

Robert Ingram, the Defendant's general manager, testified that the Debtor's account was never a problem account, and that given the Defendant's policy of providing all its commercial customers with a five-day grace period beyond the due date stated on each invoice, the disputed payments within the preference period, including the August 16, 1994 payment, made six days after the stated due date, were all timely. Mr. Ingram further testified that in 1994 approximately thirty percent (30%) of the Defendant's commercial customers made their payments within the five-day grace period; that these customers were not charged a penalty; that those customers who made their payments beyond the grace period were charged the penalty; and that it was not unusual for the Defendant to refund late-payment penalties to its commercial customers although he could not recall how often this had occurred nor did he cite specific examples of customers, other than the Debtor, who had received refunds.

Mr. Ingram acknowledged that on November 10, 1994, the day preceding the filing of the Debtor's Chapter 11 petition, he wrote a letter to Morton I. Michelson, the Debtor's president and chief executive officer, changing the payment terms governing the Debtor's account. This letter states in material part:

> Effective Monday November 21, 1994, your bill for natural gas usage will be issued on a weekly basis. We will issue the bill via fax to your Harriman office. We will expect payment via wire transfer no later than the following Wednesday.
>
> We will issue your bill for the month of October today. Payment is expected via wire transfer Monday, November 14, 1994. Your bill for November 1 through November 13 usage will be issued on November 14. Payment is expected via wire transfer Wednesday, November 16, 1994.

Mr. Ingram testified, however, and the court so finds, that this letter was precipitated by the Debtor's impending bankruptcy which was, on November 10, 1994, common knowledge among many of the Debtor's creditors. Furthermore, the October bill referred to in Mr. Ingram's letter had not yet been issued nor was it issued until November 14, 1994. Finally, Mr. Michelson testified that he had no recollection of having received the November 10, 1994 letter. Clearly, the change in policy requested by Mr. Ingram was never implemented and had no relation-

---

13. The Defendant had no written policy, but utilized the same billing and collection procedures, including the five-day penalty free grace period, for all its commercial gas customers.

14. Ms. Fox testified that this procedure was in place at all relevant times during 1994.

ship in time to the payments which are the subject of the Trustee's action.

Testifying on behalf of the Defendant as an expert witness was Dr. Michael J. Ileo. Dr. Ileo has, for approximately twenty-five years, been the President and Chief Economist for Technical Associates, Inc., a company conducting business research and studies with respect to finance and economics in several areas, including insurance and utility regulation. He obtained his Ph.D. in Economics from Virginia Tech in 1972 and has appeared as an expert witness before numerous municipal, state, provincial, and federal regulatory bodies in the United States and Canada concerning various regulatory issues in the electric, gas, telephone, and water utility industries. Dr. Ileo's testimony before these bodies has included such issues as rate levels and structure, cost allocations and separations, and demand forecasting. Over the course of his career, Dr. Ileo has reviewed the billing and collection practices of several hundred utility companies including natural gas and water utility companies and is familiar with the terms by which those utilities provide their services.

The Trustee does not dispute that Dr. Ileo is an expert in the field of utility economics and that he is qualified to testify regarding the terms of services and the billing and collection practices of public and private utilities. The court finds that Dr. Ileo is an expert in the area of public and private utilities providing gas and water services and in the billing and collection practices of these utilities.

Dr. Ileo testified that the Defendant's invoices to the Debtor were in conformity with the standard practice of the natural gas utility industry; that the five-day grace period extended by the Defendant to the Debtor and the Defendant's other commercial customers in 1994 was consistent with the usual practice in the utility industry; that it is not unusual for a utility to impose a penalty for a late payment of up to ten percent and, upon assessment of the penalty, to credit the penalty back to a large volume customer; that it was not unusual for a small utility company such as the Defendant to have unwritten policies and procedures governing billing and payment practices; that the timing of none of the disputed payments was an "aberration"

in the gas utility industry; and that his examination of the business relationship between the Debtor and Defendant "led me to conclude that the patterns exhibited by the billing and payment patterns [between the Debtor and Defendant] were perfectly consistent with what occurs in the utility business."

The Trustee called William H. Novak as an expert witness. Mr. Novak, a Certified Public Accountant, has been employed by the Tennessee Regulatory Authority (TRA) for approximately fourteen years and has served as manager of the Utility Rate Division of the Energy and Water Section for the past seven years. The TRA regulates six privately-owned natural gas utility companies in Tennessee. Mr. Novak testified that he reviews the billing practices of the six natural gas companies regulated by the TRA; that he has not testified previously in court because the six regulated companies are required to submit their rules and procedures to the TRA for approval prior to their implementation; and that he is not familiar with the billing and payment practices of any natural gas companies in Tennessee or elsewhere other than those six companies regulated by the TRA. Specifically, in response to questions propounded by the Defendant's attorney on cross examination, Mr. Novak testified as follows:

Q. Now, isn't it true, Mr. Novak, that the Tennessee Regulatory Authority governs the billing practices of only six natural gas companies in the state of Tennessee?

A. That's true.

Q. And any familiarity that you have about the billing and collection practices of a natural gas company relates to those six companies?

A. That's true.

Q. You are not familiar with the billing and collection practices of any other natural gas companies in the state of Tennessee?

A. That's true.

Q. And likewise you are not familiar with the billing and collection practices of any other natural gas utilities outside the state of Tennessee?

A. That's true.

.    .    .    .    .

Q. [I]t's still true that you have no familiarity with the billing and collection practices of any natural gas company in the entire United States other than those six?

A. That's true.

.    .    .    .    .

Q. Mr. Novak, when you give your testimony regarding what is in your opinion the standard in the industry, isn't it fair to say that what you're doing is taking what you understand the six utilities, the six gas companies, that you're familiar with and extrapolating what they do throughout the industry?

A. I would suppose that is part of it that those are the utilities that I am most familiar with.

Exc. of Tr. of September 9, 1996 Trial, Test. of William H. Novak at 7–8, 11–12, 25–26.

Although the court allowed Mr. Novak to testify over the Defendant's objection, his expertise clearly relates exclusively to his familiarity with the six natural gas companies regulated by the TRA. He could not offer testimony regarding the billing and collection practices of other gas utility companies such as the Defendant, a municipal utility, whose policies and procedures are set by a Board of Commissioners, and not the TRA. While the court recognizes Mr. Novak's expertise with regard to the billing and collection practices of the six utility companies regulated by the TRA, it is satisfied that these same practices do not necessarily prevail in the natural gas industry as a whole and, specifically, that they do not govern the policies and proce-

dures of public utilities such as the Defendant. Accordingly, Mr. Novak's testimony will not be considered as that testimony will not assist the court in resolving the issues before it.[15]

## III

## ORDINARY COURSE OF BUSINESS DEFENSE

**11 U.S.C.A. § 547(c)(2) (West 1993)**

Bankruptcy Code § 547(c)(2) provides:

The trustee may not avoid under this section a transfer—

.    .    .    .    .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

11 U.S.C.A. § 547(c)(2) (West 1993).

Discussing the interplay between § 547(b) and § 547(c)(2), the Sixth Circuit recently observed:

The preference rule aims to ensure that creditors are treated equitably based on the theory that "[u]nless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable." *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993) (citations omitted). *See also*

---

**15.** Both Dr. Ileo and Mr. Novak were called as expert witnesses to testify on the "industry standard" component of the ordinary course of business defense under 11 U.S.C.A. § 547(c)(2)(C) (West 1993).

H.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6138 (Congress intended to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy" and to further "the prime bankruptcy policy of equality of distribution among creditors"). However, "the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *Fiber–Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219–20 (3d Cir.1994) (citations omitted). *See also [Union Bank v.] Wolas*, 502 U.S. [151,] 160–61, 112 S.Ct. [527,] 532–33 [116 L.Ed.2d 514] [ (1991) ] (detailing the history of section 547 and recognizing the same competing policies under section 547(c)). Moreover, the legislative history for section 547(c)(2) states that its purpose "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.C.C.A.N. 5787, 5874.

*Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 815 (6th Cir.1996).

The Sixth Circuit has also stated that "[w]hether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination." *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989) (citing *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 742 (6th Cir.1989), *cert. denied sub nom.*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983)). The court in *Yurika Foods* further stated: "In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." *Yurika Foods,* 888 F.2d at 45. Irregular payments " 'may be considered "ordinary" for purposes of ... 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties.' " *Id.* (omission in original) (quoting *Fulghum Constr. Corp.,* 872 F.2d at 743).

Subsections (B) and (C) of § 547(c)(2) "comprise a subjective and objective component respectively." *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir.1992). "The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id. See Carled,* 91 F.3d at 813.

In the present action, the Trustee does not dispute that the four payments on the chart account were incurred by the Debtor in the ordinary course of its business and also in the ordinary course of the Defendant's business. Thus, the § 547(c)(2)(A) component has been established.

A. *The § 547(c)(2)(B) Component*

The Sixth Circuit, in *Hawes,* in discussing the "subjective component" of § 547(c)(2)(B), required a "fact-specific analysis." *Hawes,* 957 F.2d at 244. Whether the preferential payments were made in the ordinary course of business of both the Debtor and the transferee may involve an examination of many factors, including the lateness of the payment. The court stated that "[a] late payment will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties." *Id.* However, the court further stated that "[f]ailure to make a payment within the time limit set forth in the contract is presumptively 'nonordinary.' " *Id.* Obviously, one factor the court may examine is the conduct of the parties in addition to the contractual terms. The *Hawes* court stated that "a long history of dealing between parties could counteract the literal terms of a contract." *Id.*

■ In the present case, the Trustee contends that the payments made during the preference period were not "made in the ordinary course of business or financial affairs of the [D]ebtor and the [Defendant]" because they were all made after the due dates set forth in the respective invoices. The Trustee argues that six of the eight payments made by the Debtor from November 23, 1993, through July 12, 1994, were made on or before the due dates set forth in each invoice and that payments after the stated due dates were therefore not ordinary as between the parties. The court disagrees.

The record clearly establishes that to accommodate payments made by mail the Defendant provided its commercial natural gas customers, including the Debtor, a grace period of five days after the due date stated on each invoice within which to pay an invoice without a penalty. The effect of this policy was to extend the due date stated on each invoice by the five-day grace period. The Debtor was aware of the policy and availed itself of the grace period with respect to the payments delivered on August 31, September 27, and October 26, 1994. Only the August 16, 1994 payment was made outside the grace period. As between the Debtor and the Defendant, payments were not untimely unless made on or after the sixth day beyond the due date. The fact that the Debtor chose to pay the majority of the eight invoices issued by the Defendant prior to the commencement of the preference period on or prior to the due date stated on each invoice, is of no consequence.[16] The August 16, August 31, September 27, and October 26, 1994 payments were not untimely unless made after expiration of their respective due dates, inclusive of the five-day grace period. Only the August 16, 1994 payment of $90,565.03 represents a late payment.

■ The court finds that payments made within the contractual terms agreed upon by the parties are ordinary and meet the § 547(c)(2)(B) component, notwithstanding that the customer's payments may vary within the terms of the parties' agreement. For example, the court presumes that a creditor with a customer whose account is to be paid within thirty days of the date an invoice is issued but who historically pays its account within fifteen days of the invoice date will still be able to avail itself of the ordinary course of business defense if the customer pays a single invoice within the preference period on the last day the payment is due, i.e., the 30th day. Such a payment, being made within the terms of the parties' agreement, could not be considered late and would therefore not lose its status as a payment "made in the ordinary course of the business or financial affairs of the debtor and the transferee" until the day following the end of the payment cycle, i.e., the 31st day. Section 547(c)(2)(B) cannot be used to reduce or modify the terms of an agreement between a debtor and transferee merely because the debtor varies the timing of its payments so long as those payments are made in a manner consistent with the terms of the parties' agreement.

■ The court finds that the Defendant has met its burden of proof under § 547(c)(2)(B) with regard to the $139,963.40 payment made on August 31, 1994; the $103,779.53 payment made on September 27, 1994; and the $105,103.69 payment made on October 26, 1994. The Defendant has not, however, met its burden of proof under § 547(c)(2)(B) regarding the $90,565.03 payment made on August 16, 1994. Not only did the Debtor, for the first time in its business relationship with the Defendant, make a payment beyond the five-day grace period, but the Defendant, consistent with its policy of assessing a late payment for any invoice paid after the due date, inclusive of the five-day grace period, charged the Debtor a ten per-

---

**16.** Arguably, seven of the eight invoices issued by the Defendant between November 2, 1993, and June 21, 1994, were paid on or before the due date stated on each invoice. The court has discussed the fact that the December 14, 1993 invoice, due December 25, 1993, could not have been paid on the stated due date and that the February 17, 1994 invoice did not contain a due date. Only the May 20, 1994 invoice, due May 31, 1994, was indisputably paid after the stated due date.

cent late penalty of $9,056.50 which the Debtor paid on August 31, 1994. To further compound the lack of ordinariness, the Defendant refunded the penalty by crediting the Debtor's September 14, 1994 invoice thereby reducing the amount due under the terms of that invoice from $112,836.03 to $103,779.53. Mr. Ingram's testimony that it was not unusual to refund a penalty paid by a commercial customer is not supported by the evidence. He did not provide the name of any customer other than the Debtor who has received such a refund. More importantly, the assessment of the penalty and its subsequent refund was not ordinary as between the Debtor and Defendant.

## B. The § 547(c)(2)(C) Component

■ Having determined that the Defendant has not met its burden of proof under § 547(c)(2)(B) with respect to the $90,565.03 payment made to the Defendant on August 16, 1994, the court need not address this payment further within the context of § 547(c)(2). The Defendant must prevail on all three components of § 547(c)(2) if it is to avail itself of the ordinary course of business defense. *Hawes*, 957 F.2d at 243. The Defendant must, however, with regard to the three remaining payments, also satisfy the objective component of § 547(c)(2)(C), which requires "that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* at 244.

In its recent decision in *Carled*, the Sixth Circuit, noting that it had not had occasion to decide what evidence will satisfy the "industry standard" or objective component of § 547(c)(2)(C), discussed the interpretation of § 547(c)(2)(C) by the Third, Fourth, Seventh, Eighth, and Tenth Circuit Courts of Appeal. Following what it concluded is a "clear consensus among the courts of appeals," the Sixth Circuit held that " 'ordinary business terms' [under § 547(c)(2)(C) ] means that the transaction was not so unusual as to render it an aberration in the relevant industry." *Carled*, 91 F.3d at 818. In so holding, the court "reject[ed] the definition of 'ordinary business terms' adopted by the district court,

which would require that the transactions at issue resemble a *majority* of the industry's transactions," and also "reject[ed] the definition adopted by the bankruptcy court requiring [the transferee] to establish the lateness as a pattern for a *significant* percentage of specific customers." *Id.*

*Carled* involved a debtor who operated three restaurants in the Columbus, Ohio area. The debtor obtained gas service from a public utility, Columbia Gas of Ohio, Inc. (Columbia), for each of its restaurants. The debtor had a total of sixty-nine monthly transactions on its three accounts with Columbia within the year preceding termination of service in connection with the debtor's bankruptcy case. Columbia's billing cycle was a forty-one day period that began on the meter reading date and ended on the date that gas service could be terminated for non-payment. The utility sent invoices each month stating a "due date" approximately fourteen days after the delivery of the invoice. Of the debtor's sixty-nine transactions with the utility, only five payments were made before the due date. The debtor averaged thirty to thirty-two days in making payments on each of the three accounts over the life of each account. The debtor always paid within the billing cycle although it frequently waited until it received a termination notice before paying its utility bill. According to Columbia, this was fairly typical of a substantial number of its commercial customers. *Id.* at 812–13.

The Chapter 7 trustee sued to avoid those payments made after the due date within the ninety-day preference period. The trustee obtained a judgment which was affirmed by the district court. Specifically at issue was whether the debtor's payments to the utility were "made according to ordinary business terms" under § 547(c)(2)(C). To establish that the transfers were "made according to ordinary business terms," the utility offered evidence about its own billing practices to show that its pattern of accepting late payments from the debtor was not unusual. Specifically, Columbia's evidence established that ten percent of its commercial customers

made payments within thirty days or more after the meter reading date and that twenty-four percent of another utility company's gas customers were at least thirty days past due on their accounts and that it was "ordinary" for commercial customers to fall into that category. Based on this evidence, the Sixth Circuit found that "Columbia's evidence showed that it is not aberrational, unusual, or idiosyncratic for utility companies to accept late payment on their invoices as long as payment is received within the forty-one day billing cycle." *Id.* at 818. The Sixth Circuit held that the lower courts erred by concluding that Columbia failed to satisfy the objective prong of § 547(c)(2)(C). The court held that "Columbia's evidence relating to the percentage of customers who paid after the due date but within the billing cycle satisfies section 547(c)(2)(C)." *Id.* at 819.

The most distinguishing characteristic between *Carled* and the present adversary proceeding is that in *Carled* the debtor's payments were late if not paid by the "due date." In the present case, payments were not late unless made after the due date stated on each invoice as extended by the five-day grace period. In other words, the Defendant's August 12, 1994 invoice to the Debtor of $130,906.90, with a due date of August 30, 1994, stated on the invoice, was not late unless paid after September 4, 1994; the September 14, 1994 invoice of $112,836.03, with a due date of September 25, 1994, stated on the invoice, was not late unless paid after September 30, 1994; and the October 14, 1994 invoice of $105,103.69, with a due date of October 25, 1994, stated on the invoice, was not late unless paid after October 30, 1994. Each of the invoices was paid timely by the Debtor because they were paid on August 31, 1994, September 27, 1994, and October 26, 1994, respectively. This would seem to negate the need for the "industry standard" analysis as the court presumes that timely payments are the required norm within the natural gas utility industry. However, to the extent there are gas utility companies such as Columbia who do not have grace periods associated with the payment of

their invoices, the "industry standard" of § 547(c)(2)(C) becomes relevant.

The Defendant's General Manager, Robert Ingram, testified that during 1994 approximately thirty percent of the Defendant's customers paid regularly within the five-day grace period and were not charged a penalty. Janet Foland, the Defendant's office manager in 1994, testified that she had responsibility for the Defendant's accounts receivable; that the Defendant's payment terms for all customers was the same regardless of the manufacturing process utilized by the customer; that the Defendant provided its customers with a five to six-day grace period regardless of the due date stated on each invoice; and that in 1994 approximately twenty percent of the Defendant's commercial customers regularly made their payments within the grace period. The testimony of the Defendant's expert witness, Dr. Michael J. Ileo, has previously been discussed. As relevant to the § 547(c)(2)(C) "industry standard" element, Dr. Ileo testified on direct examination as follows:

Q. Dr. Ileo, will you assume for the Court that representatives of the Rockwood Water, Wastewater and Natural Gas Systems have testified that their standard business practice was to give their customers a five to six day grace period after the net amount due date before considering the payment to be late and imposing a penalty or the gross amount? Assuming that testimony, would that be consistent with the usual or standard practice in the industry?

A. Yes.

Q. I take it, then, that it wouldn't be an aberration?

A. It would not.

Exc. of Tr. of September 9, 1996 Trial, Test. of Dr. Michael J. Ileo at 11. Finally, Marie Fox of the Customer Service Payment Processing Office of KUB, whose grace period policy was, and is, similar to the Defendant's, testified that KUB's commercial gas customers are not charged a penalty if their invoices are paid within five days of the due date.

Consistent with the holding in *Carled,* this court finds that the Debtor's payments of the August 12, September 14, and October 14, 1994 invoices of $139,963.40, $103,779.53, and $105,103.69, respectively, and the Defendant's receipt of these payments within five days of the due dates stated forth in each invoice, "was not so unusual as to render [each payment] an aberration in the [natural gas and water utility] industry." *Carled,* 91 F.3d at 818.

The court accordingly finds that the Defendant has sustained its burden of proof on all components of § 547(c)(2) with regard to those payments made by the Debtor on August 31, September 27, and October 26, 1994. The Trustee may not avoid these three payments as preferential transfers. The Defendant may not, however, rely on the ordinary course of business defense under § 547(c)(2) with regard to the $90,565.03 payment made on August 16, 1994.

### IV

### NEW VALUE EXCEPTION

### 11 U.S.C.A. § 547(c)(4) (West 1993)

■ As an alternative to its ordinary course of business defense under § 547(c)(2), the Defendant asserts its entitlement to rely on the "new value" exception under § 547(c)(4). The court, having determined that the payments made to the Defendant by the Debtor on August 31, September 27, and October 26, 1994, are subject to the ordinary course of business defense and may not, therefore, be avoided by the Trustee, need address only the $90,565.03 payment made to the Defendant on August 16, 1994.

Code § 547(c)(4) provides:

The trustee may not avoid under this section a transfer—

.    .    .    .    .    .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise un-avoidable security interest;  and

(B) on account of which new value the debtor did not make an otherwise un-avoidable transfer to or for the benefit of such creditor[.]

11 U.S.C.A. § 547(c)(4) (West 1993).

■ Section 547(c)(4) thus creates an exception to the general rule that preferential transfers may be recovered for those situations in which a creditor provides new value after the preferential transfer is made but before the filing of the Debtor's bankruptcy petition. The statute defines new value as "money or money's worth in goods, services, or new credit...." 11 U.S.C.A. § 547(a)(2) (West 1993). The provision of utility services to a debtor subsequent to an avoidable transfer constitutes "new value" under § 547(c)(4). *See Nordberg v. New Orleans Pub. Serv., Inc. (In re Chase & Sanborn Corp.),* 55 B.R. 86, 88 (Bankr.S.D.Fla. 1985); *Thomas W. Garland, Inc. v. Union Elec. Co. (In re Thomas W. Garland, Inc.),* 19 B.R. 920, 929 (Bankr.E.D.Mo.1982). However, the giving of new value alone is insufficient for an application of the exception. The Debtor must not have paid for the new value by making "an otherwise unavoidable transfer to or for the benefit of such creditor" on account of the new value. § 547(c)(4)(B). Furthermore, the new value cannot be secured by "an otherwise unavoidable security interest." § 547(c)(4)(A).

The purpose of § 547(c)(4) is "to encourage creditors to deal with troubled businesses in the hope of rehabilitation." *Kroh Bros. Dev. Co. v. Continental Constr. Eng'rs, Inc. (In re Kroh Bros. Dev. Co.),* 930 F.2d 648, 651 (8th Cir.1991). As observed by the 11th Circuit, "[a] subsequent advance is excepted because ... a creditor who contributes new value in return for payments from the incipient bankrupt ... should not later be deemed to have depleted the bankruptcy estate to the disadvantage of other creditors." *Charisma Inv. Co. v. Airport Sys., Inc. (In re Jet Fla. Sys., Inc.),* 841 F.2d 1082, 1083 (11th Cir.1988) (*per curiam*). "Thus, the relevant inquiry

under section 547(c)(4) is whether the new value replenishes the estate." *Kroh Bros.*, 930 F.2d at 652.

The new value exception does not apply unless the creditor extended new value to the debtor subsequent to a preferential payment. *Waldschmidt v. Ranier (In re Fulghum Const. Corp.)*, 706 F.2d 171, 173 (6th Cir.1983), *cert. denied*, 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983). Accordingly, the exception is more properly termed the "subsequent advance rule." *Id.* Yet, new value advanced subsequent to the filing of the debtor's petition is not applicable to the § 547(c)(4) defense. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1284–85 (8th Cir.1988). The majority of courts have concluded that new value may be netted against all preceding preferential transfers as opposed to the immediately preceding transfer only. *Schilling v. Jackson Oil Co. (In re Transport Assocs., Inc.)*, 171 B.R. 232, 238 (Bankr.W.D.Ky.1994) (citing *Crichton v. Wheeling Nat'l Bank (In re Meredith Manor, Inc.)*, 902 F.2d 257, 259 (4th Cir.1990); *The Successor Comm. of Creditors Holding Unsecured Claims v. Bergen Brunswig Drug Co. (In re Ladera Heights Community Hosp., Inc.)*, 152 B.R. 964, 967–69 (Bankr.C.D.Cal.1993); *Mosier v. Ever–Fresh Foods Co. (In re IRFM, Inc.)*, 144 B.R. 886, 890–92 (Bankr.C.D.Cal.1992), *aff'd*, 52 F.3d 228 (9th Cir.1995); *Jobin v. Lalan (In re M & L Business Mach. Co., Inc.)*, 160 B.R. 851, 855–56 (Bankr.D.Colo.1993), *aff'd*, 167 B.R. 219 (D.Colo.1994)); *contra Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248 (D.Me. 1984). However, any excess new value remaining after this netting may not be used to offset a subsequent preference. *Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.)*, 159 B.R. 501, 516 (Bankr.E.D.Tenn.1993).

In the present case, the record, through Exhibit 20 filed by the Defendant, establishes that between August 17, 1994, and November 11, 1994, the Defendant made subsequent advances to the Debtor totaling $299,907.91 by continuing to supply it with natural gas on a daily basis. This new value was "not secured by an otherwise unavoidable security interest." § 547(c)(4)(A). Therefore, the court need only determine if the Debtor made "an otherwise unavoidable transfer to" the Defendant "on account of" this new value. § 547(c)(4)(B).

The court begins by noting that "[u]ntil recently, very few courts have parsed subsection (B) of section 547(c)(4) in order to apply the actual language of the statute." *Pay 'N Pak Stores, Inc. v. Slide–Co. (In re PNP Holdings Corp.)*, 167 B.R. 619, 622 (Bankr. W.D.Wash.1994). One phrase that could easily be overlooked, and was overlooked by the parties in this case, involves the first three words of subsection (B) that limit the application of the subsection to only those "otherwise unavoidable transfer[s]" given "on account of" the new value. This potential for oversight was observed in *PNP Holdings*, noting that some courts do

> not require the question, mandated by Section 547(c)(4)(B), with respect to each provision of new value, "Did the debtor make an otherwise unavoidable transfer *on account of* the new value?" Particular payments must be tied to particular invoices if we are to determine, in the language of the statute, whether, *on account of that new value*, the debtor made an otherwise unavoidable transfer to or for the benefit of such creditor.

*Id.* at 627. *PNP Holdings* proceeded to detail a mechanical "formula" to be followed in determining the applicability of § 547(c)(4)(B). This approach is recast in the following six-step analysis:

> (1) "With respect to each, individual transfer of new value, the [court] must determine whether there has been an 'otherwise unavoidable transfer' on account of the new value."

> (2) "If the new value was paid for by the debtor with a payment not alleged to be a preference ... the creditor may not avail itself of that increment of new value."

> (3) If any of the payments made by the debtor subsequent to the advancement of

new value are alleged to be preferences, the court must:

(a) "[D]etermine whether or not any of the ... alleged preferences are payments on account of the new value."

(b) "If they are, with respect to those payments, the creditor must determine whether or not it has grounds to allege that the preference is defensible under one of the statutory preference defenses in 11 U.S.C. § 547(c) other than 11 U.S.C. § 547(c)(4)."

(c) "If so, and if the creditor prevails on that defense, the new value on account of which that 'otherwise unavoidable transfer' was made cannot be utilized by the creditor as a preference defense."

*Id.* at 628–29. The court agrees that this is the approach dictated by the language of the statute and its analysis will proceed under the same.

Because the Trustee has alleged that all the payments made by the Debtor to the Defendant are preferences, the court will begin its analysis with step three. The court must first determine whether any of the alleged preferential payments were made on account of the new value extended by the Defendant. The following table summarizes the utility services on account of which the alleged preferential payments were made.

| Invoice Date | For Services Delivered | Date of Payment | Amount of Payment |
|---|---|---|---|
| 7/22/94 | 6/1/94—6/30/94 | 8/16/94 | $ 90,565.03 |
| 8/12/94 | 7/1/94—7/31/94 | 8/31/94 | $139,963.40[17] |
| 9/14/94 | 8/1/94—8/31/94 | 9/27/94 | $103,779.53[18] |
| 10/14/94 | 9/1/94—9/30/94 | 10/26/94 | $105,103.69 |

The new value in question was not extended by the Defendant until August 17, 1994, the day after the avoidable transfer of August 16, 1994. Therefore, the August 31, 1994 payment of $139,963.40 clearly was not given on account of this new value since it was made entirely in payment of natural gas provided during July 1994. On the other hand, the October 26, 1994 payment of $105,103.69 was made entirely on account of the new value since it paid for natural gas provided during September 1994. As to the September 27, 1994 payment of $103,779.53, only a portion of this payment was made on account of the new value since this transfer paid for services rendered by the Defendant for the entire month of August 1994. Therefore, the court must determine what portion of this payment was made on account of the new value extended by the Defendant during the fifteen days beginning August 17, 1994. This information is provided in an exhibit introduced by the Defendant, Exhibit 20, listing $57,573.58 as the value of the natural gas provided to the Debtor during the period of August 17–31, 1994. With this information, the court concludes that the Debtor made two payments, one of $57,573.58 on September 27, 1994, and another of $105,103.69 on October 26, 1994, on account of the new value extended to the Debtor following the August 16, 1994 preferential payment.

The second part of step three requires the court to determine whether these payments are rendered unavoidable under one of the preference defenses of § 547(c) other than § 547(c)(4). As determined by the prior analysis under § 547(c)(2), the September 27, 1994 payment to the Defendant of $103,779.53 and the October 26, 1994 payment to the Defendant of $105,103.69 are unavoidable as they were made in the ordinary course of business. Accordingly, the third part of step three dictates that the new value on account of which these payments were made cannot be used by the Defendant under § 547(c)(4). Therefore, in calculating the extent to which the August 16, 1994 preference is offset by new value given to the Debtor by the Defendant after that date, the court will not consider the value provided to the Debtor be-

---

**17.** This payment includes the $9,056.50 penalty assessed against the Debtor for the late payment of the Defendant's July 22, 1994 invoice. The late payment was credited against the amount due the Defendant on the September 14, 1994 invoice. *See supra* n. 7 and 8. The court need not make adjustments for the method by which the Defendant handled the penalty as the result remains the same.

**18.** *See supra* n. 17.

tween August 17, 1994, and September 30, 1994.

The following table summarizes the court's analysis.

| Date (1994) | Preference Payment | New Value | Check Amount | For Payment of Services Delivered | Unavoidable Transfers Made on Account of New Value |
|---|---|---|---|---|---|
| 8/16 | $90,565.03 | | | | |
| 8/17–8/31 | | $ 57,573.58 | | | |
| 8/31 | | | $139,963.40 | 7/1–7/31 | 0 |
| 9/1–9/30 | | $105,103.69[19] | | | |
| 9/27 | | | $103,779.53 | 8/1–8/31 | $ 57,573.58 |
| 10/1–10/31 | | $ 92,210.53 | | | |
| 10/26 | | | $105,103.69 | 9/1–9/30 | $105,103.69[20] |
| 11/1–11/11 | | $ 45,022.78 | | | |
| Total | | $299,910.58 | | | $162,677.27 |

Given that the Defendant extended $137,233.31 worth of new value to the Debtor "on account of which new value the debtor did not make an otherwise unavoidable transfer to" the Defendant, the court finds that the Defendant has replenished the estate with new value in excess of the amount by which it depleted the estate through the August 16, 1994 preferential transfer.[21] Under § 547(c)(4), this new value serves as a complete defense to the Trustee's attempt to avoid this transfer. Accordingly, the court holds that the Trustee will not be permitted to avoid the August 16, 1994 preferential payment of $90,565.03.

## V

## THE HOUSE ACCOUNT

■ The Trustee, as part of his claim against the Defendant, also seeks to avoid and recover a $24.58 payment made by the Debtor to the Defendant on one of the house accounts, No. 22–3750–32, in satisfaction of an invoice due August 10, 1996. This amount was paid beyond the due date stated on the invoice and the Defendant was charged a ten percent late penalty of $2.46 which it paid on September 2, 1994.[22]

The proof before the court understandably focuses almost exclusively on the chart account. The house account was defined by

19. A $2.67 discrepancy exists between this amount and the cost of gas provided during September 1994, as evidenced by Exhibit 20, which reflects the cost of gas at $105,101.02. The court finds that Exhibit 20 misrepresents the actual amount of new value provided to the Debtor during the month of September 1994. Exhibit 20 incorrectly lists the Debtor's natural gas consumption on September 20, 1994, as 1564 DTH. Exhibit 15, also introduced by the Defendant, lists the Debtor's natural gas consumption on September 20, 1994, as 1565 DTH. This error in Exhibit 20 accounts for the $2.67 discrepancy. Accordingly, the court concludes that the Defendant provided the Debtor with $105,103.69 in new value during September 1994.

20. *See supra* n. 19.

21. The $137,233.31 represents the difference between the new value ($299,910.58) and the unavoidable transfers made on account of new value ($162,677.27).

22. The record does not establish the date the Defendant received payment of the $24.58. The Debtor's check was dated August 12, 1994, two days after the August 10, 1994 due date stated on the invoice, and the parties stipulate it was honored by the Debtor's bank on August 18, 1994. The date inserted in the "Paid" stamp on the copy of the invoice filed as Exhibit 29 is illegible. The court cannot therefore make a finding as to whether the check was delivered prior to or after August 15, 1994, assuming applicability of the five-day grace period to the house account.

the Defendant as a "residential" type account. While the proof supports a finding that the Debtor historically paid the three house account invoices with a single check before the due dates stated on each invoice, it will not support a finding that the five-day grace period provided for payment of chart account invoices also had application to the "residential" type house account.[23] Furthermore, the Defendant's proof on the § 547(c)(2)(C) industry standard component does not address house accounts. In sum, the Defendant has not sustained its ordinary course of business defense with regard to the Debtor's payment of the $24.58.

 Nevertheless, as discussed in the court's analysis of § 547(c)(4), the Trustee cannot avoid a preferential payment to the extent that the Defendant gave new value so long as the Debtor did not make any subsequent transfers on account of this new value that are otherwise unavoidable. The court's analysis concluded that the Defendant could apply $137,233.31 worth of new value as a § 547(c)(4) defense to the Trustee's attempt to avoid the August 16, 1994 preferential transfer of $90,565.03. Therefore, the Defendant will not be permitted to apply $90,565.03 of its $137,233.31 in new value as a § 547(c)(4) defense to a different preferential transfer. Accordingly, the Defendant is left with a balance of $46,668.28 worth of new value that can be used as a § 547(c)(4) defense. This is more than enough to prevent the Trustee from avoiding the $24.58 preferential transfer made on August 12, 1994. Accordingly, the Trustee will not be permitted to avoid this transfer.

## VI

### CONCLUSION

For the reasons stated above, the Trustee is not entitled to a judgment avoiding and recovering any of the five payments which are the subject of this adversary proceeding. The Trustee's Complaint will accordingly be dismissed.

23. *See supra* n. 22.

A judgment consistent with this Memorandum will be entered.