**In re PARKVIEW HOSPITAL, Debtor.**

**John J. HUNTER, Trustee, Plaintiff,**

**v.**

**AMERISOURCE CORP., Defendant.**

**Bankruptcy No. 96–3192.**
**No. 94–32051.**

United States Bankruptcy Court,
N.D. Ohio.

Aug. 29, 1997.

---

**510**

John Hunter, Jr., Toledo, OH, for Plaintiff.

John T. Barga, Tiffin, OH, for Defendant.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court on the Motion for Summary Judgment of the Plaintiff and Defendant. This Court has reviewed the arguments of counsel, exhibits, and the

entire record of the case. Based upon that review, and for the following reasons, the Court finds that two of the three payments at issue in this case are preferential and should be returned to the bankruptcy estate.

## FACTS

The material facts in this case are not disputed. The Plaintiff is the Chapter 11 Trustee in this liquidating Chapter 11 case. The Debtor was a hospital which received medical supplies on a daily basis from Defendant. The Plaintiff seeks to recover from the Defendant three prepetition payments the Debtor made to the Defendant. The first of these payments was made on May 27, 1994 in the amount of Twenty–five Thousand Nine Hundred Ninety–nine and 21/100 Dollars ($25,999.21). It paid approximately 90 separate invoices and corresponding credit memos, ranging from under Two Dollars ($2.00) to over Two Thousand Dollars ($2,000.00). The invoice dates were between March 4, 1994 and March 25, 1994, and the average days between invoice and payment was approximately 72 days. The second payment the Plaintiff seeks to recover was made June 17, 1994, in the amount of Twenty–four Thousand Eight Hundred Forty–four and 52/100 Dollars ($24,844.52), which paid invoices dated March 28, 1994 to April 14, 1994. It paid approximately 90 separate invoices and credit memos an average of approximately 72 days after invoice. The third payment was made on June 24, 1994, in the amount of Forty–two Thousand Four Hundred Forty–two and 28/100 Dollars ($42,-442.28), and paid invoices dated April 18, 1994 to May 20, 1994. It paid approximately 180 separate invoices and credit memos an average of approximately 50 days after invoice.

The Plaintiff has provided a history of the payments made by the Debtor to Defendant from 1992 through the petition date. As with the payments in question, the Debtor always paid numerous invoices with a single check, usually with one or two weeks between the payments. An exception was the time between the payment preceding the first alleged preferential payment, which was approximately five weeks. Also, it appears the Debtor used another supplier (other than Defendant) between July of 1992 and August of 1993.

In 1992, there were twenty–two payments made, seven of which were greater that Twenty Thousand Dollars ($22,000.00). The average days between invoice and payment in 1992 was approximately 19.6 days, with the shortest being approximately 9.35 days and the longest being 28.2 days (with the exception of a One Hundred Seventeen and 84/100 Dollars ($117.84) payment of only two invoices that were paid an average of 42 days after invoice). In 1993, the Debtor made 18 payments to the Defendant, none of which was greater than Twenty Thousand Dollars ($20,000.00). The average days between invoice and payment in 1993 was 21.91 days, with the shortest being 11.61 days, and the longest being 31.25 days. In 1994, the Debtor made 15 payments to the Defendant before the alleged preferential payments at issue herein, none of which was greater than Twenty Thousand Dollars ($20,000.00). The average days between invoice and payment in 1994 was 31.44 days, with the shortest being 27.13 days, and the longest being 40.07 days. The average of the average days between invoice and payment beginning in 1992 and until the alleged preferential payments at issue in 1994 was 23.43 days.

The Debtor also made four payments after the alleged preferential payments at issue herein, one of which was greater than Twenty Thousand Dollars ($20,000.00). The average days between invoice and payment was 30.72 days, with the shortest being 22.1 days, and the longest being 33.96 days. The Defendant has been paid 100% of its claim by the prepetition Debtor, and is presently owed nothing from the bankruptcy estate. The Plaintiff estimates that unsecured creditors will receive about a 35% payment on their claims in this case.

## LAW

**11 U.S.C. § 547. Preferences**

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made and

'(C) such creditor received payment of such debt to the extent provided by the provisions of this title

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

(f) For purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

## DISCUSSION

Proceedings to determine, avoid, or recover preferences are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

This matter is before the Court upon the Motions for Summary Judgment of the Plaintiff and Defendant. A movant will prevail on a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), Fed.R.Civ.P. 56(c), Fed. R. Bankr.P. 7056. In order to prevail, the movant must demonstrate all elements of the cause of action. *R.E. Cruise, Inc. v. Bruggeman*, 508 F.2d 415, 416 (6th Cir.1975). Thereafter, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). See also *In re Bell*, 181 B.R. 311 (Bankr.N.D.Ohio 1995).

Unless one of the exceptions in § 547(c) applies, § 547(b) of the Bankruptcy Code provides that the trustee may avoid certain transfers made in the ninety days preceding the petition for bankruptcy as "preferences" if five conditions are satisfied. *In re Carled, Inc.*, 91 F.3d 811, 813 (6th 1996). To qualify as a voidable preference, a transfer must (1) benefit a creditor; (2) be on account of an antecedent debt; (3) be made while the debtor was insolvent; (4) be made within ninety days before bankruptcy; and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. *Id.*, quoting *Union Bank v. Wolas*, 502 U.S. 151, 155, 112 S.Ct. 527, 529–30, 116 L.Ed.2d 514 (1991).

The Defendant argues that the Trustee has not shown either that the Debtor was

insolvent at the time of the transfer, or that the payments at issue enabled Defendant to receive a larger share of the estate than if the transfer had not been made. This Court finds both these arguments without merit. For purposes of § 547, insolvency is presumed during the ninety days immediately preceding the date of the filing of the petition. 11 U.S.C. § 547(f). The Defendant has offered nothing which would counter the presumption of the Debtor's insolvency. Also, the Trustee has stated in an affidavit that the payout to general unsecured creditors will be approximately 35%, which appears to be a fair approximation in this case. The Defendant has been paid in full.

■ The Defendant also asserts two defenses to the preference rule: (1) that the payments are subject to a deduction for subsequently advanced credit pursuant to § 547(c)(4), and (2) that the payments may not be avoided because they were made in the ordinary course of the Debtor's business pursuant to § 547(c)(3). This Court will address the Defendant's § 547(c)(4) "subsequent advance rule" defense first. See *In re Fulghum Const. Corp.,* 706 F.2d 171, 172 (1983) (Section 547(c)(4) is perhaps most accurately characterized as a "subsequent advance rule.") Under this rule, "Preferential transfers as defined in § 547(b) may not be avoided by the trustee if *after* such transfer, such creditor gave new value." *Id.* (quotation and citation omitted, emphasis in original). The subsequent advance rule was accurately interpreted in *In re Chez Foley, Inc.,* 211 B.R. 25 (Bankr.D.Minn.). As the *Chez* Court explained:

> While the plaintiff argues that this section is ambiguous, it really is not. It is a difficult provision to read and understand, but once that effort is made, the provision is unambiguous and the fact that some courts have misread it, does not make it ambiguous. The section is easy to apply in a simple transaction where the debtor makes a preferential payment and then later the creditor supplies value to the debtor for which there are no further payments made. Then it is clear that the creditor is entitled to reduce the amount of any recoverable preference by the amount

of the new value that it gave, in effect, netting out the two transactions.

> The confusion comes when there is another payment by the debtor on account of the new value that is given. A simple, three-transaction example may help explain the section.

> 1. The debtor makes a preferential payment to a creditor of § 100.00. (Payment # 1)

> 2. After receipt of the payment, the creditor ships new inventory to the debtor, which has a value of $50.00.

> 3. The debtor pays the creditor $50.00 in payment for the shipment of inventory. (Payment # 2)

> Section 547(c)(4) says that if payment # 2 is not avoidable, which means that the creditor gets to keep it, then the creditor may not count the value it gave as new value to reduce the preference and it must pay the trustee the $100.00 representing a return of payment # 1.

> If, however, payment # 2 is itself a preference [or otherwise avoidable], then the creditor must pay that $50.00 preference to the trustee, but gets to use its shipment of inventory as new value to reduce the first preferential payment by $50.00. Thus, the trustee would recover $50.00 out of payment # 1 as a preference and all of payment # 2 as a preference and again collect $100.00.

> What the trustee does not get to do is recover both payments and collect $150.00 from the creditor in a situation where it has provided subsequent new value. The result is fair, it is what Congress intended, and it is precisely what the statute says.

*Id.* at 27–28.

■ Restated, the subsequent new value defense applies only where the new value received has not been paid for, or the payment for the new value is itself avoidable. This is the plain meaning of § 547(c)(4). The Defendant cites *In re IRFM, Inc.,* 52 F.3d 228 (9th Cir.1995) for the proposition that the new value advanced need not remain unpaid. However, even in *IRFM* the Court concluded that "a new value defense is permitted unless the debtor repays the new value by a trans-

fer which is otherwise unavoidable." *Id.* at 232. In this case, the Trustee does not seek the return of the payments made on the subsequent advances, nor does it appear that he could. Therefore, the subsequent advance rule does not apply.

The Defendant's ordinary course of business defense is a closer call. The Sixth Circuit Court of Appeals has explained:

[Ü]nder section 547(c)(2) of the Bankruptcy Code, the trustee may not avoid any transfer to the extent that such transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; *and*

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (emphasis added). Subsections (B) and (C) of section 547(c)(2) "comprise a subjective and objective component respectively." *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239, 244 (6th Cir.1992). "The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." Id. Pursuant to section 547(g), the creditor bears the burden of proving the nonavoidability of a transfer under section 547(c)(2) by a preponderance of the evidence. Id. at 242. *In re Carled, Inc.,* 91 F.3d 811, 813 (6th Cir.1996). It is clear in this case that the first of the three prongs of the § 547(c)(2) is met, that the debt was incurred in the ordinary course of both the Debtor and the Defendant's businesses per § 547(c)(2)(A).

Whether the payments in question were made in the ordinary course of business of the Debtor and the Defendant per § 547(c)(2)(B) is the dispositive issue in this case. The Sixth Circuit Court of Appeals also recently addressed this issue in *In re Tennessee Chemical Co.,* 112 F.3d 234 (6th Cir.1997). The Court explained:

While the resolution of this issue represents a factual determination reviewable for clear error, *In re Fulghum Const. Corp.,* 872 F.2d 739, 742 (6th Cir.1989), we have repeatedly urged bankruptcy courts to consider several factors in reaching a decision on the ordinary course question. *In re Yurika Foods Corp.,* 888 F.2d 42, 45 (6th Cir.1989). These factors include the history of the parties' dealings with each other, timing, amount at issue, and the circumstances of the transaction. *Id.* Generally, the entire course of dealing is considered. *In re White,* 64 B.R. 843 (Bankr. E.D.Tenn.1986).

*Id.* at 237.

*Tennessee Chemical* Court noted that the facts in that case posed a very close call. *Id.* At issue were two payments made 16 and 17 days after the due date during a time when the creditor had allowed the debtor to pay within 60 days of invoice rather than the usual 30 days. The Bankruptcy Court had concluded that only the history of payments during the 60 day period should be considered, and that during this time the payments were usually less than 10 days late. Accordingly, the Bankruptcy Court had determined that the payments made 16 and 17 days late were abnormal and therefore preferential. *Id.* at 236–237. The Court of Appeals reversed, apparently declining to consider only the 60 day period:

While the circumstances of this case pose a very close question, we believe that [the debtor's] history of late payments to [the creditor] is so extensive that the two payments in dispute were made in the ordinary course of business. Accordingly, we reverse the bankruptcy court on this issue.

[The debtor] had made 149 payments to [the creditor] in the previous two and one-half years. When it had 30 days to pay, all but a few payments had been late. In fact, they had been late by up to 64 days, meaning that some were paid up to 94 days after the invoice date.

When the terms were lengthened to 60 days, most payments continued to be late. The most delinquent payments, other than the two in question, were 12, 13, 15 and 37 days late, meaning payment was made 72 to 97 days after the invoice date.

In short, [the debtor] was a struggling company that paid when it could. Even though the two payments at issue were among the latest (though not the absolute latest), they were not out of the ordinary course of business between the two parties. [The debtor] had a pattern of paying several invoices with one check, as it did in this case. Of course, this means that the very same check is "late" in varying degrees.

\* \* \* \* \* \*

Since the payment "dates" in question are the dates received in [the debtor's] office, which is affected by variability in the delivery of mail, it seems ill–advised to rely too heavily upon a difference of a few days.

\* \* \* \* \* \*

The disputed invoices were due on January 21 and 22, 1989, a Saturday and Sunday. The check was mailed on February 3, a Friday less than two weeks later, and received on February 7, a Tuesday, just over two weeks late. Looking at the pattern, it is impossible to say that the payments at issue fell outside the ordinary course of business based upon a few days deviation from the overall pattern of payment.

Finally, we must consider the equities. [The creditor] was a regular supplier. It was getting paid, though from a slow payer. Under the bankruptcy court and district court rulings, [the creditor] is punished for not terminating its relationship with [the debtor] sooner. Under such an approach, a supplier needs to have rigid bright-line rules to protect itself, otherwise it puts itself at risk. However, the 'ordinary course of business' exception is intended to cover precisely the type of situation now before us, allowing suppliers and other furnishers of credit to receive payment within the course that has developed in the commercial relationship between the parties unless *substantial deviations* from established practices occur.

*Id.* at 237–238 (emphasis added). From this decision it can be seen that a careful analysis of the timing of invoices and payments must be undertaken to make a determination under § 547(c)(4)(B). It is noteworthy that the Court considered the payments at issue, with a deviation of only a few days, to be a very close call that could even be affected by variability of mail delivery.

■ In the case at bar, the invoices in question were more than just a few days later than usual. In all of 1992 through 1993, there were only two other payments where the average of the days between the invoices and payments was greater than 40 days. Two of the alleged preferential payments at issue herein averaged 72 days between invoice and payment, while the third averaged about 50 days. It is clear that the two payments which were made an average of 72 days after invoice were "substantial deviations" from the average of 23 days in 1992 through 1994, and even the average of 32 days in 1994.

However, as in *Tennessee Chemical,* the Debtor was a struggling company that paid when it could. The Court looked at the equities, noting that the creditor was a regular supplier, as was the Defendant herein, and that the creditor should not be punished for not terminating its relationship with the Debtor sooner. In the case at bar, the Defendant also continued to do business with the Debtor notwithstanding its belated cash flow. For these reasons this Court concludes that though the payment made an average of 50 days after the invoice date was a deviation from the ordinary course of business practices between the Debtor and the Defendant, it was not a "substantial deviation" as required under *Tennessee Chemical.* Other payments had been made an average of 40 days after the invoice date, and as in *Tennessee Chemical* "it seems ill-advised to rely too heavily upon a difference of a few days." Further, as in *Tennessee Chemical,* there is a similar problem of the various lateness of the individual invoices that were paid with these payments. Also, considering the goal of pro-

viding creditors protection for providing credit within the ordinary course of a business with a struggling or slow paying debtor, this Court believes that this holding which protects a payment which averaged 50 days after invoice, where historically payments were made about 23 days after invoice, adequately addresses this concern.

■ However, this Court must also bear in mind the policy behind allowing the estate to recover preferences for the benefit of other, unfavored, creditors. In this case it is clear that the Debtor considered the Defendant an important creditor with whom a good relationship should be maintained, even though it could not continue to pay other creditors. Indeed, the Defendant was owed nothing at the time the bankruptcy petition was filed. The Debtor fell behind substantially regarding the invoices which were paid about 72 days after invoice, and made payments which were substantially larger than usual in 1993 and 1994 (though similarly large payments were made in 1992, apparently when business was better). Further, after "catching up" with these payments, the Debtor made four subsequent payments which averaged 34 days after invoice even as it contemplated and filed for bankruptcy within the month. It therefore can be seen that the deviation as to these payments, which more than doubles or triples the time period within which invoices were usually paid, was "substantial" as required by *Tennessee Chemical.* From these facts, and considering all the equities, this Court concludes that the two payments made an average of 72 days after invoice dates were outside the ordinary course of business between the Debtor and the Defendant.

This Court must also consider the third prong of the § 547(c)(4) inquiry. That is, whether the alleged preferential payments were made "according to ordinary business terms," which focuses on the payment practice in the relevant industry. The Sixth Circuit has also recently had the opportunity to address this element of the ordinary course of business exception to the preference rule. The Court discussed in detail the prevailing opinion among the various circuits, explaining:

Several other circuits have interpreted section 547(c)(2)(C) to mean that transactions will be deemed in accordance with "ordinary business terms" unless they are "unusual" or extraordinary in relation to similar transactions in the same industry. In a leading case the Seventh Circuit held that "ordinary business terms" includes a range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside the broad range should be deemed extraordinary and therefore outside the scope of subsection (C).

\* \* \* \* \* \*

The Third Circuit also found that the more cemented (as measured by its duration) the preinsolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain with the safe harbor of § 547(c)(2). Thus, the court adopted a sliding scale standard for subsection (C) whereby the quantum of proof required would vary based on the strength of the evidence under the subjective prong.

\* \* \* \* \* \*

[T]he Eight Circuit held that in light of the statute's construction and its legislative history, the focus of subsection (c)(2)(C) should be on whether the terms between the parties were particularly unusual in the relevant industry, and that evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems is sufficient to satisfy subsection (c)(2)(C)'s burden.

\* \* \* \* \* \*

Similarly, the Fourth Circuit has stated that it reads section 547(c)(2)(C) as establishing the requirement that a creditor prove that the debtor made its prepetition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection (C) allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to

be unusual remain with subsection C's protection.

     \*     \*     \*     \*     \*     \*

Following [this] clear consensus among the courts of appeals that have interpreted section 547(c)(2)(C), we hold that "ordinary business terms" means that the transaction was not so unusual as to render it an aberration in the relevant industry. Therefore, we reject the definition of "ordinary business terms" adopted by the district court, which would require that the transactions at issue resemble a majority of the industries transactions, and we also reject the definition adopted by the bankruptcy court requiring [the creditor] to establish the lateness as a pattern for a significant percentage of particular customers.

91 F.3d at 816–818 (quotations and citations omitted).

Following this precedent, which allows for a broad interpretation of "ordinary business terms," this Court finds it very unlikely that the payments at issue could be remotely outside ordinary business terms in a "relevant industry." From a thorough review of the briefs submitted it does not appear that the parties even consider it much of an issue in this case. Nor does the Court.

Finally, Defendant has offered a copy of a check written by it to the Debtor which Defendant contends was the repayment of an overpayment made by the Debtor. This check was for Seventeen Thousand Seven Hundred Twenty and 75/100 Dollars ($17,-720.75). The Defendant has offered no explanation or evidence as to what payments on what invoices this check returned, or whether it was payment for supplies returned to Defendant postpetition after the Debtor ceased operations (as the Trustee appears to believe). In this situation, this Court would expect Defendant to have this information readily available, because it would not have written the check without it. Accordingly, this Court finds no basis to credit this amount or any portion of it from the recoverable preferences found herein.

For all these reasons, this Court finds that the payment made on May 27, 1994, in the amount of Twenty–five Thousand Nine Hundred Ninety–nine and 21/100 Dollars ($25,-999.21), and the payment made June 17, 1994, in the amount of Twenty–four Thousand Eight Hundred Forty–four and 52/100 Dollars ($24,844.52), were preferential payments made outside the ordinary course of business. This Court also finds that the payment made June 24, 1994, in the amount of Forty–two Thousand Four Hundred Forty–two and 28/100 Dollars ($42,442.28), was made in the ordinary course of business and is therefore not recoverable. In reaching the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the Plaintiff may recover from the Defendant the amount of Fifty Thousand Eight Hundred Forty–three and 73/100 Dollars ($50,843.73). Pursuant to Rule 3002(c)(3), the Defendant may file a proof of claim in the related bankruptcy case within 30 days after the date this Judgment becomes final.