**In re CARLED, INC., Debtor.**

**Frederick M. LUPER, Trustee,
Plaintiff–Appellee,**

v.

**COLUMBIA GAS OF OHIO, INC.,
Defendant–Appellant.**

No. 94–4315.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1996.

Decided Aug. 2, 1996.

Frederick M. Luper (argued), Columbus, OH, Ruth A. Hohl (briefed), Luper, Wolinetz, Sheriff & Neidenthal, Columbus, OH, for Appellee.

James R. Berendsen (argued and briefed), Theodore J. Gallagher, Columbia Gas Distribution Companies, Columbus, OH, for Appellant.

Rosemary E. Grieme (briefed), Cincinnati Gas & Electric Co., Cincinnati, OH, for Amicus Curiae.

Before: MARTIN, NORRIS, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Appellant Columbia Gas of Ohio, Inc. ("Columbia") appeals from the district court's order affirming the bankruptcy court's order holding that the Chapter 7 trustee Frederick M. Luper (the "Trustee") may avoid as preferential transfers under 11 U.S.C. § 547(b) payments made by Carled, Inc. (the "Debtor") to Columbia within the ninety days preceding the filing for bankruptcy. For the reasons that follow, we reverse.

I

The Debtor operated three restaurants in the Columbus, Ohio area. The Debtor obtained gas service from Columbia, a public utility operating in Ohio, for each of its restaurants for approximately one year. Before service was terminated in connection with the Debtor's bankruptcy proceeding, the Debtor had a total of sixty-nine monthly transactions on its three accounts with Columbia. Columbia's billing cycle is a forty-one day period that begins on the meter reading date and ends on the date that gas service could be terminated for nonpayment. Columbia sends invoices each month stating a "due date" approximately fourteen days after the delivery of the invoice. Of the Debtor's sixty-nine transactions with Columbia, only approximately five payments were made before the due date. Columbia sent termination notices to the Debtor on several occasions but never terminated the Debtor's service until the Debtor filed for bankruptcy. The Debtor took an average of thirty to thirty-two days to make payments on each of the three accounts over the life of the accounts. Except for one period of account

realignment,[1] the Debtor always paid within the billing cycle. However, the Debtor frequently waited until it received a termination notice before paying its utility bill. According to Columbia, this is fairly typical of a substantial number of commercial customers.

## II

■ Unless one of the exceptions from section 547(c) applies, section 547(b) of the Bankruptcy Code provides that the trustee may avoid certain transfers made in the ninety days preceding the petition for bankruptcy as "preferences" if five conditions are satisfied. 11 U.S.C. § 547. To qualify as a voidable preference, a transfer must "(1) benefit a creditor; (2) be on account of antecedent debt; (3) be made while the debtor was insolvent; (4) be made within 90 days before bankruptcy; and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made." *Union Bank v. Wolas*, 502 U.S. 151, 155, 112 S.Ct. 527, 529–30, 116 L.Ed.2d 514 (1991). It is undisputed that all of the elements required to establish a voidable preference under section 547(b) have been established in this case. *See Luper v. Columbia Gas of Ohio, Inc.*, 170 B.R. 355, 357 (Bankr.S.D.Ohio 1994).

■ However, under section 547(c)(2) of the Bankruptcy Code, the trustee may not avoid any transfer to the extent that such transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; *and*

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (emphasis added). Subsections (B) and (C) of section 547(c)(2) "comprise a subjective and objective component respectively." *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir.1992). "The subjective prong (subsection (B)) requires proof that

the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* Pursuant to section 547(g), the creditor bears the burden of proving the nonavoidability of a transfer under section 547(c)(2) by a preponderance of the evidence. *Id.* at 242.

■ Whether a transaction comports with the standards for business conduct within an industry is a factual determination that we will not set aside unless it is clearly erroneous. *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989). *See also* Fed. R.Bankr.P. 8013; *Fred Hawes*, 957 F.2d at 242. "A finding of fact is 'clearly erroneous' when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Fred Hawes*, 957 F.2d at 242 (citations omitted). Although the factual underpinnings of the bankruptcy court's decision must be upheld unless clearly erroneous, the application of the legal standard to the facts is a question of law that we review de novo. *Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852, 857 (6th Cir.1988). Therefore, in the instant case, we must treat the bankruptcy court's evidentiary findings as factual determinations and analyze whether the evidence supports the bankruptcy court's legal conclusions as a matter of law.

## III

Only subsection (C) of section 547(c)(2) is at issue in this appeal. The bankruptcy court and the district court held that although Columbia proved the first two elements of section 547(c)(2), it failed to prove that the Debtor's payments to Columbia in the ninety days preceding bankruptcy were "made according to ordinary business terms" under section 547(c)(2)(C). *See Luper*, 170 B.R. at 358; District Court Opinion, at 9.

---

1. Account realignment is a reordering of when the meters are read. No termination notices are

sent out during the period affected by realignment.

To establish the third prong of the ordinary course of business exception, Columbia presented the following evidence relating to industry standards for billing for gas service. First, Columbia offered evidence about its own billing practices to show that its pattern of accepting late payments from the Debtor was not unusual. According to Columbia, a customer that failed to pay its bill by the "due date" stated on the invoice would suffer no "discernable consequences" (e.g., termination of service or adverse impact on credit rating) so long as the customer paid its bill within the forty-one day billing cycle described above. In addition, twenty percent of Columbia's customers paid their bills after the thirtieth day in the billing cycle, which begins on the meter reading date. Furthermore, ten percent of Columbia's commercial customers make their payments thirty days or more beyond the meter reading date. (Testimony of Roger Clark, Manager of Residential and Commercial Collections for Columbia Gas Distribution Companies, J.A. 240, 244).

Second, Columbia offered evidence about the billing practices of public utility companies with which it is affiliated in Kentucky, Maryland, Pennsylvania, and Virginia. Each of these companies have billing cycles that allow customers more than thirty days to pay for service even though they receive an invoice stating an earlier "due date." (J.A. 237–38). Furthermore, each of these affiliated companies were required to send termination notices that extended the total billing cycle to between thirty-six to forty-eight days. (Id.).

Third, Columbia introduced evidence about the billing practices of East Ohio Gas Company ("East Ohio Gas"), a gas utility operating in Ohio and serving approximately one million customers, including approximately 70,000 commercial customers. (J.A. 117–18). Arthur J. DeFazio, the Credit Manager of East Ohio Gas, testified that East Ohio Gas has a credit or billing cycle of approximately forty-four days, which is similar to Columbia's billing cycle. (J.A. 121). He also characterized the "due date" on the invoice as a "motivating factor" because when a customer missed the "due date" but paid before the

end of a billing cycle, East Ohio Gas would take no action except to threaten termination of service. (J.A. 124–25). In addition, DeFazio testified that twenty-four percent of the customers of East Ohio Gas were delinquent, i.e., at least thirty days past due on their accounts and that it is ordinary for commercial customers to be more than thirty days late paying their utility bills before they are subject to termination of service. (J.A. 126, 134).

Finally, Columbia presented evidence about the difficulty of obtaining information from other utility companies (i.e., their competitors) relating to collection deficiencies because such information is not generally known or disseminated and is considered proprietary. (Clark Tr. at J.A. 241–42; DeFazio Dep. at J.A. 146–47).

## IV

After a hearing, the bankruptcy court found that Columbia's evidence failed to establish that the transfer was made "according to ordinary business terms" under section 547(c)(2)(C). Although the bankruptcy court acknowledged that the deposition testimony of the representative from East Ohio Gas "established that it is common for a percentage of utility service invoices to be paid more than thirty (30) days after invoice," it found this proof deficient because "[t]he evidence did not show ... that any significant percentage of particular customers of a utility provider consistently and routinely pay outside a 30–day period." *Luper*, 170 B.R. at 358. The bankruptcy court found that to meet the third prong of the "ordinary course" defense, Columbia had to show more than the fact "that a percentage of its invoiced customers pay late." *Id.* Rather, the bankruptcy court insisted that Columbia had to establish the lateness "as a pattern for a significant percentage of specific customers." *Id.*

The district court affirmed the bankruptcy court's decision, finding that

[e]vidence that a certain percentage of all invoices are paid late is not evidence of an industry standard which permits customers to deviate from the terms of payment stated in the invoice. Such a percentage

could represent a combination of idiosyncratic transactions where some customers, representing the majority who usually pay on time, make a rare late payment while others representing a small percentage of habitually delinquent customers continue a long standing pattern of late payments. District Court Opinion, at 5 (J.A. 47). Furthermore, the district court stated that "[e]ven if the Court were to accept appellant's evidence as evidence of industry practice, the rate of delinquency, commercial, residential or combined, would not be significant enough to show that the payments in question were made according to ordinary business terms." *Id.* at 8 (J.A. 50). The district court held that "[f]or a practice to be ordinary, it should be done at least a majority of the time." *Id.* Using this standard, the district court concluded that Columbia's evidence did not establish that it is ordinary for customers to pay late because "the overwhelming majority of customers pay their utility bills in a timely manner." *Id.*

## V

Columbia argues that we should reject the lower courts' definition of "ordinary business terms" under section 547(c)(2). Because the Bankruptcy Code does not define the phrase "ordinary business terms," *see Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739, 743 (6th Cir.1989), we construe the provision in light of the purposes of the preference statute and its exceptions. *See* 11 U.S.C. § 547(b) and (c)(2). The preference rule aims to ensure that creditors are treated equitably based on the theory that "[u]nless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable." *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1032 (7th Cir.1993) (citations omitted). *See also* H.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6138 (Congress intended to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy" and to further "the prime bankruptcy policy of equality

of distribution among creditors"). However, "the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *Fiber-Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.),* 18 F.3d 217, 219–20 (3d Cir.1994) (citations omitted). *See also Wolas,* 502 U.S. at 160–61, 112 S.Ct. at 532–33 (detailing the history of section 547 and recognizing the same competing policies under section 547(c)). Moreover, the legislative history for section 547(c)(2) states that its purpose "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.C.C.A.N. 5787, 5874.

Analyzing section 547(c)(2)(C) in *Fred Hawes,* we held that "courts do not look only at the manner in which one particular creditor interacted with other similarly situated debtors, but rather analyze whether the particular transaction in question comports with the standard conduct of business within the industry." 957 F.2d at 246. *See also Yurika Foods,* 888 F.2d at 45 (practice deemed objectively ordinary under section 547(c)(2)(C) because eighty-two percent of carriers in the industry follow the same practice). In *Fred Hawes,* the bankruptcy court found that the transferee had not presented credible evidence that the disputed transfers were made according to industry standards, and we held that the transferee had not shown that this finding was clearly erroneous. *Id.* at 246. However, we have never had occasion to decide what evidence will satisfy the "industry standard" prong of section 547(c)(2).

Several other circuits have interpreted section 547(c)(2)(C) to mean that transactions will be deemed in accordance with "ordinary business terms" unless they are "unusual" or extraordinary in relation to similar transactions in the same industry. In a leading case, the Seventh Circuit held that "ordinary

business terms" includes a "range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Tolona Pizza*, 3 F.3d at 1033. The Seventh Circuit also held that establishing the industry standard component under subsection (C) "does not mean that the creditor must establish the existence of some single, uniform set of business terms...." *Id. See also In re Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir.1995). The Seventh Circuit based its interpretation on what it identified as the two purposes of section 547(c)(2)(C). First, subsection (C) has an evidentiary purpose such that "[i]f the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony." *Tolona Pizza*, 3 F.3d at 1032. Second, section 547(c)(2)(C) "allay[s] the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy." *Id.* Applying this standard in *Tolona Pizza*, the Seventh Circuit found that the preferential payments at issue were made in accordance with ordinary business terms based on the testimony of the creditor/transferee that payment within thirty days "is within the outer limits of normal industry practices" even though it was longer than the terms stated in the invoice. *Id.* at 1033.[2]

The Third Circuit adopted the *Tolona Pizza* definition of "ordinary business terms" except that it replaced the word "idiosyncratic" with "unusual." *Molded Acoustical Prods.*, 18 F.3d at 224. Like the Seventh

Circuit, the Third Circuit stated that subsection (C) does not require "that the creditor must prove the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle." *Id.* The Third Circuit reasoned that the Seventh Circuit's analysis "affords meaning to subsection C and yet does not render it so exacting that a creditor is forced—both when soliciting new customers and when embroiled in a preference proceeding—to depend upon information about its competitor's trade practices, information that the competitors oft will be reluctant to yield and that frequently the creditor will find difficult to obtain." *Id.*[3] The Third Circuit also found that "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)." *Id.* at 225. Thus, the court adopted a sliding scale standard for subsection (C) whereby the quantum of proof required would vary based on the strength of the evidence under the subjective prong. This approach bears out the "evidentiary purpose" rationale posited by the Seventh Circuit, i.e., that subsection (C) is designed to bolster the subjective prong, subsection (B).

Applying these standards in *Molded Acoustical Products*, the Third Circuit concluded that the payments in question were not "made in accordance with ordinary business terms." The transferee offered evidence comparing the debtor's payment history against that of two other firms to whom it sold similar product portfolios, one of which was the subsidiary of the other, both of which were delinquent in their payments to the transferee, and both of which eventually "threw in the towel and exercised the bankruptcy option." *Id.* at 222–23, 228. The

2. The Seventh Circuit also pointed out potential problems with the proof required under subsection (C). The court noted that not only is it difficult to identify the industry whose norm shall govern (e.g., in *Tolona Pizza*, where the issue was whether payments a pizza maker made to its sausage supplier within the ninety days preceding bankruptcy were avoidable preferential transfers, was the industry the sale of sausages to makers of pizza, the sale of sausages to anyone, the sale of anything to makers of pizza?), but also

there can be great variance in billing practices within an industry. Thus, whether the "industry" is defined broadly or narrowly might be determinative. *Id.* at 1033.

3. Several circuits have acknowledged the "specter of antitrust liability" as a reason to discourage the sharing of information between or among competitors. *E.g., id.*

court rejected this evidence, reasoning that "ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships." *Id.* at 227. Moreover, the court found that the transfers at issue represented a gross departure from the prior course of dealing between the parties and that the transferee had tried to place the debtor on a "payment plan," an action apparently taken in response to a deteriorating creditor-debtor relationship. *Id.* at 228. The court concluded that such evidence indicated that even the transferee itself did not deem its relationship with the debtor to be normal at that time. *Id.*

Using a similar approach, the Eighth Circuit held that in light of the statute's construction and its legislative history, "the focus of subsection (c)(2)(C) should be on whether the terms between the parties were *particularly* unusual in the relevant industry, and that evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems is sufficient to satisfy subsection (c)(2)(C)'s burden." *Jones v. United Savings and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark., Inc.),* 9 F.3d 680, 685 (8th Cir.1993) (emphasis added). *See also Jones Truck Lines, Inc. v. Full Service Leasing Corp.,* 83 F.3d 253, 257 (8th Cir.1996) (reaffirming holding of *U.S.A. Inns*). *U.S.A. Inns* involved late payments that were similar to "eight to ten percent" of the creditor's accounts. 9 F.3d at 685. Based on the testimony of one witness, the transferee's Chairman of the Board, President and Chief Executive Officer, that "it is regular practice in the savings and loan industry to work with delinquent customers as long as some type of payment is forthcoming," *id.,* the court concluded that the transferee had "carried its burden of proof of demonstrating conformity with industry practice in dealing with late loan payments, and ... satisfied the objective requirement of subsection (c)(2)(C) by showing that such late loan payments are common within the savings and loan industry ..." *Id.* at 686.

Similarly, the Fourth Circuit has stated that it reads section 547(c)(2)(C) "as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be 'unusual' remain within subsection C's protection." *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1050 (4th Cir.1994) (quoting *Molded Acoustical,* 18 F.3d at 226). In *Advo–System,* the Fourth Circuit rejected the transferee's assertion that the late payments at issue were "made according to ordinary business terms" because it found that the transactions in that case were a gross departure from the industry norm. *Id.* at 1052. The evidence showed that the transferee normally required prepayment from its customers, so it was unusual for the transferee to extend credit at all much less work with delinquent customers.[4] *Id.* Furthermore, the court focused on the "erratic" nature of the debtor's payments to the transferee before the preference period (ranging from two days to over one hundred days from receipt of an invoice) such that one could not "feel confident that 'late' payments during the insolvency period were unmotivated by unusual creditor pressure or dictated by the debtor's financial woes." *Id.* & n. 6 (citation omitted).

There is some disparity among the circuits regarding the treatment of distressed debtors within a particular industry. For example, the Tenth Circuit has interpreted "ordinary business terms" under section 547(c)(2)(C) to mean "terms that are used in usual or ordinary situations." *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994). It rejected an alternative interpretation that "ordinary business terms" could mean "terms

---

4. In *Advo–System,* the transferee was a direct mail marketing company that offered its services on a nationwide basis. It argued that it should not be compared to local or regional direct mail advertisers. Therefore, the court assumed arguendo that the transferee's business represented the industry norm. *Id.* at 1050.

that creditors in similar situations commonly would use, even if the situation itself is extraordinary," reasoning that "[t]he preference section does not discourage 'unusual action' simply because others in the industry wouldn't respond to similar circumstances in the same way." *Id.* Rather, "[i]t discourages 'unusual action' that may favor certain creditors or hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out." *Id.* Therefore, in *Clark*, the Tenth Circuit found that the creditor had not established that the payments at issue were "made in accordance with ordinary business terms" because the transferee, a mortgage lender for commercial real estate developments, entered into escrow agreements with the debtors over a year after the debtors had signed promissory notes and after the debtors had defaulted on their loans. *Id.* at 1552–54. The court held that entering into escrow arrangements was not a normal financing relationship based on evidence in the record showing that "creditors in the industry use such an arrangement only in extraordinary circumstances, when debtors are in trouble." *Id.* at 1554. *See also Molded Acoustical Prods.*, 18 F.3d at 227 (stating that under section 547(c)(2)(C), the focus must be on healthy creditor-debtor relationships). On the other hand, the Second Circuit recently held that "[i]f the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 42 (2d Cir. 1996) (collecting cases). The court "decline[d] to adopt a rule that payments made pursuant to debt restructuring agreements, even when the debt is in default, can never be made according to ordinary business terms as a matter of law." *Id.* at 41. This conflict in authorities regarding the question of how an industry deals with distressed participants need not be resolved here, since Columbia accepted late payments throughout its relationship with the Debtor, and the bankruptcy court specifically found that "[t]here was no evidence of any unusual collection activity, service shut off, or personalized communication between the parties." 170 B.R. at 358.

█ Following the clear consensus among the courts of appeals that have interpreted section 547(c)(2)(C),[5] we hold that "ordinary business terms" means that the transaction was not so unusual as to render it an aberration in the relevant industry. Therefore, we reject the definition of "ordinary business terms" adopted by the district court, which would require that the transactions at issue resemble a *majority* of the industry's transactions, and we also reject the definition adopted by the bankruptcy court requiring Columbia to establish the lateness as a pattern for a *significant* percentage of specific customers. Columbia's evidence showed that ten percent of its commercial customers made payments thirty days or more after the meter reading date and that twenty-four percent of East Ohio Gas's customers were at least thirty days past due on their accounts and that it was "ordinary" for commercial customers to fall into that category. Accordingly, Columbia's evidence showed that it is not aberrational, unusual, or idiosyncratic for utility companies to accept late payment on their invoices as long as payment is received within the forty-one day billing cycle.

## VI

█ We also reject the conclusions of the district court and the bankruptcy court that Columbia was required to show that particular customers routinely paid their bills late. In *Lovett v. St. Johnsbury Trucking*, 931

---

5. The Second Circuit states that "[o]nly the Court of Appeals for the Eleventh Circuit has held that no evidence of industry practice beyond the conduct of the debtor and creditor in question is necessary to satisfy § 547(c)(2)(C)." *Roblin Indus., Inc.*, 78 F.3d at 39 (citing *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566–67 (11th Cir.1986)). However, the *Craig Oil* case turned on the transferee's failure to prove the subjective prong of section 547(c)(2). In that case, the transferee had been asked by another creditor to join in an involuntary petition forcing the debtor into bankruptcy. The transferee declined but subsequently called the debtor to request that future payments be made by cashier checks. The Eleventh Circuit held that the trustee could avoid the payments made by cashier checks because the payments were not in the ordinary course of business. *Craig Oil*, 785 F.2d at 1568.

F.2d 494 (8th Cir.1991), the bankruptcy trustee of a freight consolidator and distributor sought to recover payments from a common carrier for services rendered. The Eighth Circuit held that the debtor's payments to the transferee during the 90–day period were made "according to ordinary business terms" because the "manner, form, and timing of these payments were consistent with the practice both parties followed previously." *Id.* at 499. Moreover, in regard to the general practice in the industry regarding the time of payment, the transferee "introduced testimony ... that it is 'common' in the trucking industry—even when 30–day payment terms are required by contract—for payments 'to be made over a 30–day period' (i.e., after 30 days from the date of invoice) and that it is '[v]ery common' in the industry 'that people pass the 30 day period.'" *Id.*[6] Thus, the Eighth Circuit apparently did not require proof that particular industry members consistently paid late. *See also Tolona Pizza,* 3 F.3d at 1033 (finding that the evidence showed that "payment within 30 days is within the outer limits of normal industry practices"); *U.S.A. Inns,* 9 F.3d at 684–85 (holding that the transferee provided sufficient evidence that its transfer comported with industry standards: the transferee proved that "'probably eight to ten percent' of [its] accounts were on a similar pay schedule as [the debtor's]" and that "working with delinquent customers as long as some type of payment was forthcoming was common industry practice.").

A similar approach was posited in *Advo-System,* where the Fourth Circuit analyzed the level of generality at which the industry norm should be characterized. 37 F.3d at 1051. The transferee argued that the industry norm was "to work with its customers and [to] extend credit to some customers ... instead of requiring prepayment." *Id.* The court held that the transferee's standard was too general and would render subsection (C)

"virtually meaningless." *Id.* It used the following example to illustrate:

> Suppose an industry where member businesses typically extend credit. If those businesses, in an effort to satisfy subsection C, could simply assert, without providing specific evidence on credit terms, that the industry norm is to extend credit, then every preference payment received by those businesses would satisfy subsection C. Preference payments are by definition credit payments and therefore would never be unusual vis-a-vis that proffered norm. Yet within that same industry there likely would be a range of credit terms that one would consider to be normal, for example, payment within 30 to 40 days after receipt of an invoice. If a preference payment's terms do not fit within that normal range of credit terms (e.g., a preference payment made 100 days after receipt of an invoice), then the preference payment would fail subsection C notwithstanding that the extension of credit would not itself be unusual.

*Id.* This example, albeit dicta, supports the position that while it would not suffice for a transferee to state generally that a certain percentage of its customers paid their bills "late," it would be sufficient to prove that a certain percentage of customers pay within a certain number of days after the due date. Moreover, we recognize the difficulty of obtaining more precise information from competitors in light of antitrust and proprietary concerns, especially where, as here, the relevant industry is comprised of a small number of competitors. *See, e.g., Molded Acoustical Prods.,* 18 F.3d at 224.

Accordingly, we hold that Columbia's evidence relating to the percentage of customers who paid after the due date but within the billing cycle satisfies section 547(c)(2)(C). We note that there has been no evidence to suggest that customers who routinely pay

---

6. We note that the *Lovett* court was unclear about whether section 547(c)(2)(C) "requires comparison between the payment record of the particular debtor and the general practice in the industry regarding the time of payment...." *See id.* at 499. *See also U.S.A. Inns,* 9 F.3d at 684 ("The *Lovett* court explicitly left open the question of what proof was required under sub-

section (c)(2)(C) and inferentially endorsed the view that subsection (c)(2)(C) requires an objective standard."). As indicated above, the law in this circuit and the prevailing view generally is that the objective prong of section 547(c)(2) requires proof of industry standards. Nonetheless, we find *Lovett* instructive.

their gas bills after the due date but within the forty-one day billing period are treated differently than customers who do so only sporadically or on one occasion. Therefore, Columbia was not required to show that particular delinquent customers routinely paid their utility bills late in order to satisfy section 547(c)(2)(C), as the bankruptcy court and the district court suggested.

## VII

Since the bankruptcy court and the district court erred by concluding that Columbia failed to satisfy the objective prong of section 547(c)(2), we REVERSE the decisions of the lower courts and hold that the Trustee may not avoid as preferential transfers the payments the Debtor made to Columbia during the ninety days preceding the bankruptcy filing.