ELECTRONIC CITATION: 2008 FED App. 0010P (6th Cir.)
File Name: 08b0010p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re: MURRAY, INC., ) | |
| ) | |
| Debtor. ) | No. 07-8064 |
| _____ ) | |
| ) | |
| WILLIAM KAYE, ) | |
| ) | |
| Plaintiff - Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| AGRIPOOL, SRL ) | |
| ) | |
| Defendant - Appellee. ) | |
| _____ ) | |

Appeal from the United States Bankruptcy Court
for the Middle District of Tennessee, Nashville Division.
Case No. 04-13611; Adversary No. 05-0715.

Argued: May 14, 2008

Decided and Filed: July 24, 2008

Before: RHODES, SCOTT, and SHEA-STONUM, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:** Jeffrey P. Nolan, PACHULSKI, STANG, ZIEHL & JONES, Los Angeles, California, for Appellant. Randal S. Mashburn, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Nashville, Tennessee, for Appellee. **ON BRIEF:** Jeffrey P. Nolan, PACHULSKI, STANG, ZIEHL & JONES, Los Angeles, California, Phillip G. Young, Jr., BASS, BERRY & SIMS, Nashville, Tennessee, for Appellant. Randal S. Mashburn, John H. Rowland, Courtney H. Gilmer, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Nashville, Tennessee, for Appellee.

1

---

## OPINION

---

JOSEPH M. SCOTT, JR., Bankruptcy Appellate Panel Judge. William Kaye, Trustee of the Murray Liquidating Trust ("Trustee"), appeals an order of the bankruptcy court dismissing his adversary complaint against Agripool, SRL ("Agripool") to avoid certain payments as preferential transfers and recover $271,242.90 pursuant to 11 U.S.C. §§ 547 and 550. The bankruptcy court found that Agripool proved the ordinary course of business defense under 11 U.S.C. § 547(c)(2). For the reasons that follow, we reverse and remand.

### I. ISSUES ON APPEAL

The issues presented by this appeal are whether the bankruptcy court erred when it (1) failed to draw an adverse inference that Agripool applied pressure upon the Debtor for payments because Agripool did not produce requested emails; and (2) found that Agripool met its burden of proof that the ordinary course of business defense applied and, as a result, dismissed the Trustee's complaint.

### II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to decide this appeal. The United States District Court for the Middle District of Tennessee has authorized appeals to the Panel, and neither party has timely elected to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). The dismissal of the Trustee's complaint is a final order as it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted).

The bankruptcy court's conclusions of law are reviewed de novo. *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940 (6th Cir. 2007). "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Menninger v. Accredited Home Lenders (In re Morgeson)*, 371 B.R. 798,

2

800 (B.A.P. 6th Cir. 2007). The court's findings of fact are reviewed under the clearly erroneous standard. *In re DSC, Ltd.*, 486 F.3d at 944. "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504 (1985)).

### III. FACTS

Agripool, SRL ("Agripool") is a foreign company with its headquarters in Italy and manufacturing facilities in both Italy and Hungary. Agripool primarily manufactures parts for lawn and garden equipment, with an emphasis on bags which are attached to equipment for catching grass, leaves and snow. From 2003 to 2004, 75% of Agripool's revenues were derived from the manufacture of grass catcher bags for lawnmowers, and 99% of the products manufactured by Agripool in that time period were lawn and garden products.

Murray, Inc. ("Debtor") was a manufacturer of lawnmowers and snow blowers with its principal place of business in Brentwood, Tennessee. In 2003, Agripool and the Debtor began negotiations for Agripool to become a supplier of grass catcher bags for lawnmowers manufactured by the Debtor. The negotiations culminated with Agripool supplying the Debtor with polypropylene grass catcher bags for its 20 and 22 inch push mowers. The contractual terms for payment were 60 days from date of issuance of an invoice. Shipments took place by containership.

The first order for the bags was placed on October 23, 2003. Over the course of the parties' dealings, Agripool issued sixteen invoices to the Debtor, twelve before the preference period and four during the preference period. All payments by the Debtor, both prior to and during the preference period, were made by wire transfer. In July 2004, the Debtor placed an order for 200,000 bags for the 2005 season. As a result, Agripool was to be the exclusive provider of bags to the Debtor for the 2004-2005 season.

In February 2004, several hundred thousand of the Debtor's lawnmowers were recalled due to a product defect. As a result, the Debtor's owner missed its capital contribution which violated the Debtor's bank covenants and placed it in default. The Debtor's lender, GE Financing, then

3

refused to extend its prior ceiling of credit resulting in limited funds for future ongoing operations. In April 2004, the Debtor missed its sales forecast by $30 million. By July 2004, large retailers of the Debtor's products learned of the Debtor's financial crisis and pulled its products for the 2005 sales year. In September 2004, the Debtor laid off 30% of its salaried work force. Agripool, however, was unaware of the Debtor's financial difficulties at this time. In August 2004, the Debtor made two payments to Agripool on four invoices totaling $271,242.90 which brought its balance current.

On November 8, 2004, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. The bankruptcy court confirmed the Debtor's liquidation plan on September 23, 2005. On October 14, 2005, the Trustee filed an adversary complaint against Agripool seeking to recover $271,242.90 in payments made between August 10, 2004, and November 8, 2004, the preference period, by the Debtor to Agripool in satisfaction of four invoices. Agripool responded to the complaint asserting the "ordinary course of business" defense under 11 U.S.C. § 547(c)(2).

The parties stipulated that the Trustee met his burden of proof as to each of the elements of 11 U.S.C. § 547(b) and that the sole issue to be determined was the applicability of the ordinary course of business defense set forth in § 547(c)(2). On June 11, 2007, the bankruptcy court held a trial at which the former Controller of the Debtor, the former Cash Management Manager of the Debtor, the Business Development Manager of Agripool, and experts for each side on the issue of "ordinary course of business" testified. On October 9, 2007, the bankruptcy court issued a memorandum opinion concluding that Agripool was entitled to the ordinary business defense and an order dismissing the Trustee's complaint. The Trustee's timely appeal followed.

## IV. DISCUSSION

11 U.S.C. § 547(b) provides that the Trustee may avoid certain preferential transfers made in the ninety days preceding the petition for relief as preferences if five conditions are satisfied. A transfer must "'(1) benefit a creditor; (2) be on account of antecedent debt; (3) be made while the debtor was insolvent; (4) be made within 90 days before bankruptcy; and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made.'" *Luper v. Columbia Gas*

4

*of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 813 (6th Cir. 1996) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 155, 112 S. Ct. 527, 529-30 (1991)). The parties stipulated that all of the elements to establish a voidable preference under § 547(b) were satisfied.

Pursuant to 11 U.S.C. § 547(c) the transferee of a preferential payment may prevent avoidance to the extent that such transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). As the creditor, Agripool bears the burden of proving by a preponderance of the evidence that the preferential payments it received are not avoidable under § 547(c)(2). *In re Carled, Inc.*, 91 F.3d at 813. The parties agree that the Debtor's debts to Agripool were incurred in the ordinary course of business as required by subsection (A). Therefore, only subsections (B) and (C) are in dispute and at issue in this appeal.

## A. **11 U.S.C. § 547(c)(2)(B) - THE SUBJECTIVE PRONG**

Subsection (B) is a subjective component of the ordinary course of business defense which requires proof that the debt and the payment thereof are ordinary in relation to other business dealings between this particular creditor and debtor. *In re Carled, Inc.*, 91 F.3d at 813. Whether a payment is made in the ordinary course of business is a factual determination which we will not set aside unless it is clearly erroneous. *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir. 1989) (citing *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir. 1989)). In a case such as this, we treat the evidentiary findings of the bankruptcy court as factual determinations subject to the clearly erroneous standard, and analyze the evidence to determine whether it supports the legal conclusions of the bankruptcy court as a matter of law. *In re Carled, Inc.*, 91 F.3d at 813. While this is a factual determination, in reaching a decision on the issue, the Sixth Circuit Court of Appeals has instructed courts to consider factors including the history of the parties' dealings with one another, timing, the amount at issue, and the circumstances of the

5

transaction. *Brown v. Shell Canada Ltd. (In re Tenn. Chemical Co.)*, 112 F.3d 234, 237 (6th Cir. 1997). "Generally, the entire course of dealing is considered." *Id*. (citing *In re White*, 64 B.R. 843 (Bankr. E.D. Tenn. 1986)). For example, if a debtor typically made late payments, then late payments will be considered as within the ordinary course of business under § 547(c)(2)(B). *In re Yurika Foods Corp.*, 888 F.2d at 44. If the transactions in question are consistent with the dealings of the parties, even though irregular, they may be considered "ordinary" for the purposes of § 547(c)(2). *Id*. at 45.

An additional factor to be considered under subsection (B) is whether the creditor engaged in any unusual action to collect the debt. *Michigan Consolidated Gas Co. v. Solomon (In re Indus. Metal Fabricators)*, 902 F.2d 33, 1990 WL 57232, at *4 (6th Cir. 1990) (unpublished table decision). If the creditor engages in unusual collection practices, and the debtor makes a payment in response, the debtor's subjective intent in making the payment is relevant as to the ordinariness of the payment. *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 401 (Bankr. S.D. Ohio 1998) (citing *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir. 1986)).

The Trustee's first argument on appeal is that as a result of Agripool's failure to produce emails from 1994 between Agripool and the Debtor, he was entitled to an adverse inference that pressure was applied to the Debtor to obtain the transfers during the preference period making the payments out of the ordinary. During the discovery process, the Trustee propounded requests for production of documents to Agripool which sought documents memorializing communications between Agripool and the Debtor. Although numerous documents were produced, including some emails, no emails from 2004 were produced. At trial, Matteo Castelli ("Castelli"), Agripool's Business Development Manager, testified that while he may have some emails from 2004 communications with the Debtor, he had acknowledged at his deposition that he did not do a very good job of searching for them. (Appellant's App. at 522-525.) He also acknowledged at trial that the documents which were produced did not contain any emails from 2004. (Appellant's App. at 527.)

6

Castelli testified, however, that Agripool never applied any unusual collection efforts upon the Debtor. (Appellant's App. at 500-01.) Nor did Agripool ever request any financial assurances from the Debtor. (Appellant's App. at 500-01.) Moreover, the Debtor's former controller, Thomas Sharpe, testified that he did not inform Agripool of the Debtor's financial difficulties and was never asked by Agripool to bring the balance current. (Appellant's App. at 625.) Additionally, the Debtor's former Cash Management Manager, Perry Adams, testified that she did not recall Agripool asking her to bring the balance current. (Appellant's App. at 634.)

"'[T]he general rule is that [w]here relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it.'" *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 712 (6th Cir. 2007) (quoting *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000)). This rule is a permissive one which directs that the inference *may* be drawn by the trier of fact; it is not mandatory. *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of Am. v. Nat'l Labor Relations Bd.*, 459 F.2d 1329, 1349 (D.C. Cir. 1972) (Tamm, J., dissenting); *see also Central States v. U.S. Truck Co. Holdings, Inc. (In re U.S. Truck Co. Holdings, Inc.)*, 341 B.R. 596, 608 (E.D. Mich. 2006). "'Whether to draw the inference is a matter of discretion for the fact finder.'" *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1098 (7th Cir. 1994) (quoting *Int'l Union, UAW v. NLRB*, 459 F.2d at 1339)). The rule is one more of common sense than of common law and is no different than other inferences which are weighed by fact finders. *Id.* (citing *Int'l Union, UAW v. NLRB*, 459 F.2d at 1335)).

Because drawing such an inference is a matter of discretion for the bankruptcy court, we review it for an abuse of discretion. "An abuse of discretion occurs only when the [trial] court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Volvo Commercial Fin. LLC the Americas v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 685 (B.A.P. 6th Cir. 2005) (citing *Schmidt v. Boggs (In re Boggs)*, 246 B.R. 265, 267 (B.A.P. 6th Cir. 2000)). A court also abuses its discretion "if the reviewing court has a definite and firm conviction that the trial court committed a clear error of judgment in the conclusion that it reached based on all of the appropriate factors." *Belfance v. Black*

*River Petroleum, Inc. (In re Hess)*, 209 B.R. 79, 80 (B.A.P. 6th Cir. 1997) (citing *Bowling v. Pfizer, Inc.* 102 F.3d 777 (6th Cir. 1996)). We must ask "whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." *Mayor and City Council of Baltimore, Md. v. W. Va. (In re Eagle-Picher Indus., Inc.)*, 285 F.3d 522, 529 (6th Cir. 2002).

In his Proposed Final Statement of Facts and Conclusions of Law submitted after trial, the Trustee asserted that he was entitled to an adverse inference on the issue of collection efforts. (Appellant's App. at 365.) The bankruptcy court did not specifically address this assertion in its memorandum opinion. It found, however, that "there was no proof at trial of any unusual collection activity by [Agripool] during the preference period that resulted in the payment of any amounts at issue. . . ." (Appellant's App. at 461-62.) The bankruptcy court went on to find:

> Mr. Castelli confirmed that [Agripool] received its last pre-petition payment from the debtor two months prior to the petition date. He also testified that [Agripool] did not exert any payment pressure on the debtor prior to the petition date and [Agripool] was not aware that the debtor was suffering financial difficulties until immediately before the petition date. *Mr. Castelli's testimony was both credible and consistent* with his testimony concerning the timing of the payments received by [Agripool] during the preference period. Mr. Castelli's testimony as to the seasonal nature of the business between the parties went unchallenged. And as Mr. Castelli testified, the payments received by [Agripool] in the summer of 2004 represented the logical conclusion of the parties' 2004 relationship, one that placed the debtor's lawn products in the hands of retailers in the spring of 2004.

(Appellant's App. at 462.) (emphasis added.)

We infer, therefore, that the bankruptcy court rejected the Trustee's argument and declined to draw an adverse inference based on the testimony of the witnesses. The bankruptcy court is in the best position to assess the witnesses' testimony and determine the credibility of those witnesses. *See Official Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp. (In re Valley-Vulcan Mold Co.)*, 237 B.R. 322, 327 (B.A.P. 6th Cir. 1999) (citing *Sicherman v. Diamondcut, Inc. (In re Sol Bergman Estate of Jewelers, Inc.)*, 225 B.R. 896, 904 (B.A.P. 6th Cir. 1998)). The

bankruptcy court was not *required* to draw an adverse inference from Agripool's failure to produce emails from 2004. It appears that, based on the testimony of the witnesses, the bankruptcy court did not believe any such emails would reveal that Agripool engaged in any unusual collection activities. The bankruptcy court did not abuse its discretion by failing to draw the requested adverse inference.[1]

Even if the "missing" emails were to reveal that there had been a demand for payment, collection practices alone do not prevent the transfers from being ordinary. Collection practices are just one factor to be considered by the fact finder. Even where a creditor sends a series of demand letters to a debtor, the Sixth Circuit Court of Appeals, upon consideration of all relevant factors, has found payments to be in the ordinary course of business. *See, e.g., Brown v. Shell Canada Ltd. (In re Tenn. Chemical Co.)*, 112 F.3d 234 (6th Cir. 1997). The bankruptcy court considered all of the relevant factors–the timing of the transfers, the amount, the manner in which the transfers were made, and the entire circumstances under which the transfers were made–in concluding that Agripool met its burden of proof under § 547(c)(2)(B).

The Trustee further argues that the issue of collection pressures is additionally important because the parties' business relationship was not long enough to determine whether the payments during the preference period were in the ordinary course of business. Specifically, the Trustee argues that "[i]t is difficult to determine factual consistency in the record since it was not disputed that the pre-preference period lasted only one season, or nine months. While [Trustee] readily acknowledges the standard in the Sixth Circuit does not demand absolute consistency or perfection in timing, a finding of pressure offends the policy basis for allowing a transfer to be shielded regardless of similarity in timing." (Appellant's Br. at 20.)

---

[1] We question whether the Trustee properly raised this issue in the bankruptcy court. He did not file a motion to compel the discovery, no supplemental request for production of documents was made, and no pre-trial motion requesting that an adverse inference be drawn was filed by the Trustee. However, because we conclude that the bankruptcy court did not abuse its discretion in presumably refusing to draw such an inference, we need not determine whether the issue was properly raised.

9

Agripool's expert witness, Harold Schaeffer ("Schaeffer"), testified that the average number of days between invoice and payment preceding the preference period was approximately 80 days, and was 84 days during the preference period. Timing of payments before the preference period ranged from 62 to 126 days, and from 67 to 105 days during the preference period. Based on these facts, Schaeffer concluded that the preferential transfers were in the ordinary course of business between the parties. On the other hand, the Trustee's expert witness, Michael Atkinson ("Atkinson"), testified that he could not make a meaningful comparison between the pre-preference and post-preference period transfers because there were not enough pre-preference transactions. The bankruptcy court agreed with Schaeffer's analysis and concluded that the transfers made during the preference period were in the ordinary course of business between these parties.

The Sixth Circuit Court of Appeals has held that a transaction can be in the ordinary course of business even if it is the first such transaction the parties have made. *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990). Here there were nine months of transactions before the preference period. Those transactions included twelve invoices and ten payments before the preference period, and four invoices and two payments during the preference period. The bankruptcy court was not clearly erroneous in finding that there was sufficient evidence upon which to conclude that the transfers were in the ordinary course of business between these parties.

The bankruptcy court also considered the manner in which the payments were made. Testimony at trial showed that all payments, both before and during the preference period, were made by wire transfer. Further, as the bankruptcy court found, there was no change in the terms of credit between the parties. The bankruptcy court did not err in finding that Agripool met its burden of proof under § 547(c)(2)(B).

## B. 11 U.S.C. § 547(c)(2)(C) - THE OBJECTIVE PRONG

Subsection (C) is an objective component of the defense which requires proof that the transactions in question comport with the standards in the relevant industry. *In re Carled, Inc.*, 91 F.3d at 813. In analyzing whether a transaction meets the requirements of § 547(c)(2)(C), "'courts do not look only at the manner in which one particular creditor interacted with other similarly situated

debtors, but rather analyze whether the particular transaction in question comports with the standard conduct of business within the industry.'" *Id*. at 815 (quoting *Logan v. Basic Distr. Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 246 (6th Cir. 1992)). In the Sixth Circuit, "ordinary business terms" as used in § 547(c)(2)(C) means "that the transaction was not so unusual as to render it an aberration in the relevant industry." *Id.* at 818. It does not mean that the transactions in question must conform with the *majority* of the industry's transactions, or that the creditor establish that the nature of the transaction in question resembles the pattern of a *significant* percentage of its customers. *Id.*

"Whether a transaction comports with the standards for business conduct within an industry is a factual determination that [is not to be] set aside unless clearly erroneous." *In re Carled, Inc.*, 91 F.3d at 813 (citing *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir. 1989)). The Trustee asserts two errors in regard to the objective prong of this defense. First, he asserts that the bankruptcy court erred in concluding that Agripool is in the lawn and garden tractor and garden equipment manufacturing industry. Second, he contends that the court erred in accepting the testimony of Agripool's expert which made subjective adjustments to objective data.

Castelli testified at trial that during the 2003 and 2004 time period, 75% of Agripool's revenues were generated by the production and sale of grass catcher bags for lawnmowers and 98 to 99% of all products manufactured by Agripool at that time were lawn and garden products. (Appellant's App. at 530-31.) He further testified that the grass catcher bags manufactured by Agripool were constructed of polypropylene. (Appellant's App. at 492.) Based upon that information, Agripool's expert concluded that Agripool was in the "lawn and garden tractor and garden equipment manufacturing industry." (Appellant's App. at 542.) The Trustee's expert, however, concluded and testified that Agripool was in the "canvas and related products" industry based on interviews with employees of the Debtor, review of Agripool's website (although he said he could not read it because the text is in Italian), review of discovery including the deposition of

Castelli[2], and the classification given to Agripool by Hoover's, a Dun & Bradstreet company. (Appellant's App. at 647.) Agripool's expert, Schaeffer, rejected the contention that Agripool was in the "canvas and related products" industry because, as he testified, that industry classification "revolves around sails, tarps, possibly tents" and Agripool's primary focus was parts for lawnmowers. (Appellant's App. at 542.)

The bankruptcy court noted that the Trustee's expert did not conduct a physical examination of any of Agripool's products. The court also found that Castelli's testimony that the grass catcher bags were made of polypropylene, not canvas, was unrefuted, and that none of the bags manufactured by Agripool contain cotton or canvas. Ultimately, the bankruptcy court concluded that Agripool is in the "Lawn and Garden Tractor and Garden Equipment Manufacturing" industry. (Appellant's App. at 464.) Based on the evidence presented at trial, the bankruptcy court was not clearly erroneous in finding that Agripool was in the "Lawn and Garden Tractor and Garden Equipment Manufacturing" industry.

Agripool's expert, Schaeffer, then testified that the preferential payments fell within the range of payments in the "Lawn and Garden Tractor and Garden Equipment Manufacturing" industry. He reached this conclusion by analyzing information obtained from the Risk Management Association ("RMA"), a 94 year old non-profit organization that supplies credit information.

Schaffer made certain adjustments to the RMA data because, according to him, it does not include foreign companies. He testified that "[b]efore we could actually compare [the transactions between the parties and those in the relevant industry] we had to take into consideration the environment that revolved between the parties." (Appellant's App. at 546.) Because Agripool is a foreign company which shipped its products to the Defendant via containership, Schaeffer made a 30-day downward adjustment of the data from the payment history between the parties to reflect the time required to transport goods from Italy to a United States port by ship, including the time necessary

_____

[2] The particular testimony upon which he relied was Castelli's statement that Agripool produces "rider bags, walk-behind bags, blower bags, strap harnesses" and a new product also "made of fabric." (Appellant's App. at 301.)

to clear customs. (Appellant's App. at 497 & 547.) He also explained that there are different considerations for a foreign company extending credit to a U.S. company, such as "country risk, which would be the political condition of that particular company; the economic risk, which would be the financial condition of that particular country itself; the monetary risk, which is currency." (Appellant's App. at 546-47.) With this adjustment, Schaeffer testified, he was able to compare the payment history of the parties with the industry data compiled by RMA. (Appellant's App. at 548.)

On cross-examination by the Trustee's attorney, Schaeffer conceded that not all international companies necessarily extend 60-day credit terms to U.S. customers, and that some companies may ship products to U.S. customers by air rather than ship. (Appellant's App. at 555-56.) He did not research whether other international companies in the relevant industry ship their products to the U.S. by containership. (Appellant's App. at 557.) If an international company ships by air, Schaeffer testified, the 30-day adjustment would not be necessary. (Appellant's App. at 556.) Furthermore, Schaeffer conceded he did not know how long it typically takes for similar products to clear U.S. customs, which was a factor he asserted was considered in making the 30-day adjustment. (Appellant's App. at 561.) Finally, Schaeffer conceded that Dun & Bradstreet data, which is used by some experts in his field (including the Trustee's expert), but which he does not consult, includes data regarding international transactions. (Appellant's App. at 566.)

With the 30-day downward adjustment, Schaeffer concluded that the payments of the Debtor to Agripool averaged 54 days.[3] (Appellant's App. at 549.) According to the RMA data for the relevant industry reviewed by Schaeffer, the average in the industry is 23 to 58 days. Therefore, Schaeffer concluded that the preferential payments fell within the industry range. (Appellant's App. at 549.) Schaeffer conceded, however, that absent the downward adjustment in the data, the payments were outside of the ordinary course of business. (Appellant's App. at 553-54.)

---

[3] Schaeffer, Agripool's expert, testified that the average days between invoice and payment during the preference period was 84 days. The adjusted days between invoice and payment was 54 days. The range of timing of the payments, before adjustment, was 67 to 105 days, and after adjustment was 37 to 75 days.

13

On the other hand, the Trustee's expert, Atkinson, testified, based on RMA data and Dun & Bradstreet data[4], that the high and low average payments in the "canvas and related products" industry were 20 to 49 days between invoice date and date of payment. (Appellant's App. at 648-49.) Based on the industry data, Atkinson testified that any payment outside that industry range was outside the ordinary course of business. (Appellant's App. at 648-49.)

The bankruptcy court found that Schaeffer's 30-day downward adjustment was understandable, and that his testimony and analysis was "credible and sound." (Appellant's App. at 465.) The court further found that the Trustee's expert failed to examine the appropriate industry, and, therefore, his testimony did not present credible evidence regarding the ordinary business terms of similar companies. Accepting the testimony of Agripool's expert, the bankruptcy court found that none of the transfers were "so unusual as to render them an aberration" in the industry. (Appellant's App. at 465.)

The Trustee argues that the bankruptcy court erred in allowing Agripool's expert to make subjective adjustments to the industry data to take into account transport of the product by ship. He further argues that by selecting industry data which was limited to domestic sales, Schaeffer used either the "wrong industry, wrong data, or insufficient data." (Appellant's Br. at 25- 26 n.11.) Specifically, he asserts that Schaeffer's testimony does not meet the *Daubert* standard for expert testimony because there was no reliable methodology employed by Schaeffer in making the adjustments to the objective data of RMA.

The Trustee also argues that because the parties' relationship was limited to nine months prior to the preference period, the industry standard is especially critical to the analysis. When the relationship of the parties is relatively new, the credit terms "will have to endure a rigorous comparison to credit terms used generally in a relevant industry." *Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re Issac Lease Co., Inc.)*, 389 F.3d 1205, 1210-11 (11th Cir. 2004); *see also Advo-System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1049-50 (4th Cir. 1994) (holding that industry norm is critical where business relationship is fairly new because "there is no baseline against which

_____

[4] Atkinson testified that Dun & Bradstreet includes international figures.

14

to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy.").

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the United States Supreme Court held that Federal Rule of Evidence 702 requires a trial judge to assure the reliability, as well as the relevance, of scientific testimony or evidence. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167 (1999), the Supreme Court extended *Daubert* to non-scientific expert testimony, requiring that "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, [] the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id*. at 149 (quoting *Daubert*, 509 U.S. at 592). Furthermore, "[a]lthough F.R.E. 703 has greatly liberalized the law regarding the type of information on which an expert may base his opinion, that liberalization has not eliminated the requirement that an expert ground his opinion on reliable data rather than pure speculation." *Coal Res., Inc. v. Gulf & Western Indus., Inc.*, 865 F.2d 761, 772 n.4 (6th Cir. 1989) (citations omitted).

The Panel concludes that Schaeffer's opinion regarding the ordinary course of business in the industry is not grounded on reliable data, but rather is based on speculation. Schaeffer stated that he believed that the RMA industry data available only accounted for domestic sales, rather than both domestic and international sales. Schaeffer then determined that he should make an adjustment to the industry data based on international shipping times in order to compare the amount of time taken to pay. This analysis required speculation on three levels.

First, Schaeffer speculated that it was necessary to adjust the time to pay for international sales because of the increased shipping time. However, he offered no evidence or data to support the conclusion that ordinary course payments in the industry took longer for international sales due to increased shipping times. The bankruptcy court thus had no reliable basis for accepting Schaeffer's assertion that this adjustment was necessary.

Second, Schaeffer speculated that shipping took 30 days. However, he arrived at this time period based on the shipping arrangements between these parties, not based on any evidence regarding any shipping arrangements within the industry. Specifically, he did not know whether all

foreign companies in the industry ship using the same methodology as these parties. Nor did he provide any evidence regarding the time required for these types of products to clear customs. This distinction is critical because the focus of § 547(c)(2)(C) is on the industry, not the parties.

Finally, and perhaps most importantly, Schaeffer offered no basis to conclude that even if shipping adds 30 days to the buyer's time in acquiring the purchased goods, the industry then adds 30 days to pay for the goods. It was pure speculation on his part. Accordingly, the bankruptcy court should not have accepted Schaeffer's testimony that a 30 day adjustment was appropriate in evaluating whether Agripool met its burden under § 547(c)(2)(C).

Agripool failed to show any reliable data regarding the industry standards for the timing of payments on international transactions. Therefore, Agripool failed to carry its burden of proving § 547(c)(2)(C). Because the parties had stipulated that all the elements of § 547(b) were met, and Agripool did not prove its defense, the bankruptcy court should have entered judgment for the Trustee in the amount of his claim.

## V.   CONCLUSION

The order dismissing the Trustee's adversary complaint is, therefore, REVERSED. The bankruptcy court shall enter judgment for the Trustee in the amount of his claim.

16